UNITED STATES, Appellee

v.

ELLIOTT MACK NORTON, Private, U. S. Army, Appellant
1 USCMA 411, 4 CMR 3

No. 98
Decided June 2, 1952

Lt. Col. James C. Hamilton, USA, and 1st. Lt. James A. Hagan, USA, for Appellant.

Lt. Col. Thayer Chapman, USA, and 1st. Lt. Eugene L. Grimm, USA, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

On May 1, 1951, petitioner was tried by general court-martial on two charges, the first involving violation of Article of War 61, 10 U.S.C. § 1533, absence without proper authority from his company at Pusan, Korea; and the second involving violation of Article of War 96, 10 U.S.C. § 1568. The latter charge included four specifications, each alleging a separate and distinct assault with a dangerous instrument, to wit: a knife. Petitioner entered a plea of not guilty and after a trial on the merits the court returned a finding of guilty on all specifications. Petitioner was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor for one year. The convening authority approved the findings and sentence, the board of review in the office of The Judge Advocate General of the Army affirmed, and accused petitioned this Court for a review of the findings and conviction. We granted the petition but limited our review to a determination of whether the evidence was sufficient to support the findings of guilty on three of the four specifications alleging assault with a dangerous weapon. This limitation was imposed for the reason that the evidence supports clearly the other offenses and no other assigned error was considered important or prejudicial. Apparently petitioner does not seriously contend that one other assault is subject to attack as oral arguments were devoted to only two of the specifications. We shall, however, review the evidence on the three specifications to show why we arrive at the conclusion that it is sufficient to sustain the findings.

The events upon which the specifications were based occurred on March 4th and 5th, 1951, at which time accused was a member of a unit located in Pusan, Korea. At approximately 10 o'clock P.M. on the night of March 4th,

**411**

1951, a bed check of his company was ordered, and the accused was found to be absent. The testimony of the commanding officer of his company established that his absence was not authorized. At 7:30 A.M. the following morning accused failed to report to work call, and a thorough search was without avail. He returned to his company about 1 o'clock P.M. that afternoon. Approximately 4 hours after his return, he entered a tent where Pvt. Arline and Pfc. Ferwerda were engaged in a conversation. Accused approached them and stated that he had heard what they said about him. Pvt. Arline then prepared to leave the tent; and, in response to a question from the accused, stated that he was going on pass. Accused directed Arline to get a pass for him, to which Arline replied that he was not the first sergeant. Accused then reached down to his boot, drew a knife therefrom, and waved it back and forth across Arline's chest. As Arline backed up against the wall of the tent, accused turned toward Sgt. Johnson who had just entered the tent, and demanded to know if Johnson was a "friendo." Johnson replied that he and the accused got along all right. Accused then placed the blade of the knife against Johnson's stomach and again inquired whether Johnson was a friend. Johnson told him that he did not like to play with knives.

While accused was talking with Johnson, Ferwerda and Arline started to leave the tent. As they were going out the entrance accused grabbed Ferwerda's shirt collar and jerked him around. As Ferwerda turned, he noticed the knife in the hand of accused with the blade about twelve inches from his body. To protect himself he grabbed and held the arm of the accused. He subsequently released his hold, stopped back and picked up a carbine for his protection.

Turning again to Arline, accused asked if he were his friend. After a few remarks accused seemed to agree to Arline's suggestion that they go to accused's tent, but as soon as they were outside the accused started swinging his knife again, and at this time he cut Arline on the wrist.

Thereafter, accused went to another tent where Pfc. Darter was seated on a bed writing a letter. Accused struck Darter on the back of the head and demanded a match. Darter replied that he had none, and accused told him to get one quickly, again striking him. As Darter arose from the bed, accused drew a knife from his pocket and thrust it at Darter's stomach. Darter flinched but accused continued to wave the knife. Darter grabbed his carbine and left the tent.

Accused testified in his own behalf and stated that he and the others, with the exception of Sgt. Johnson, had been drinking; that he had obtained the knife from the tent of Sgt. Price to use in opening a can of sardines; that he recalled scuffling and fighting over some whiskey, but that he had not intended to assault anyone, he was just playing and meant no harm.

As previously stated, the three specifications now under attack allege the commission of the offense of assault with a dangerous weapon. The Manual for Courts-Martial, U. S. Army, 1949, page 244, applicable to these offenses, states as follows concerning an assault:

"An assault is an attempt or offer with unlawful force or violence to do a corporal hurt to another. It may be either an actual attempt to commit a battery upon the person of another or a putting of the other in reasonable fear of immediate bodily harm."

This statement in the Manual was amplified in the case of United States v. Price, 1947, 70 BR 175. In that case a board of review stated:

"It is thus apparent that the offense of assault rests upon two legal theories, one being that an assault is an attempt to commit a battery upon the person of another and the other being that an assault is a putting in reasonable fear of immediate bodily harm. Much confusion is found in the reported cases because of an all too frequent tendency to apply but one of these theories to the exclusion of the other, both being equally valid and each having its own application to a given factual situation. For ex-

412

ample, pointing an unloaded pistol which the assailant knows to be unloaded at another not in obvious jest might not, strictly speaking, be considered an attempt, for the assailant is cognizant of his inability to commit a battery by shooting, but as we have seen, it is none the less an assault, for there has been a putting in fear. And pointing a loaded pistol with intent to shoot it at one whose back is turned and who is unaware of the impending application of violence to his person, although not a putting in fear, is yet an attempted battery and, therefore, an assault."

While the provision of the Manual and the quoted authority recognize the two theories, under either there must be an overt act indicating an attempt to inflict violence or harm upon another together with an intent, actual or apparent, to do so. Accordingly, to support the findings of guilty to each specification there must be evidence of an assault upon the named victims with a certain weapon or instrument under either of the two theories above described; and it must be shown that the weapon or thing was used in a manner likely to produce death or great bodily harm; and there was an actual or apparent intent to inflict corporal hurt on the victims.

We turn now to the evidence first to determine its sufficiency to support the finding that accused assaulted Sgt. Johnson. Johnson testified that accused approached him, demanding to know whether he was a friend. After replying that they got along all right, the witness turned around to his barracks bag to complete his preparations for leaving to go on pass. Accused followed and repeated his question, this time with a knife in his hand. Johnson turned to the accused and replied that he did not play with knives. Though Johnson's version contains an implication that he was not afraid and saw nothing hostile in accused's actions, he nevertheless testified he did not like to play with knives. Be that as it may, the record is clear that accused placed the blade of the knife against Johnson's stomach as he repeated his query, despite the fact that no provocative act on the part of the victim was shown.

In testifying in his own defense accused related his version of the incident in which Johnson was accosted and stated that he had placed the knife against Johnson's stomach, but that he had done it merely to illustrate the actions of a Korean whom he had seen approach a soldier in a public tavern. He further testified that his only intention was to show Johnson how the Korean had acted.

It is argued that this testimony, when coupled with Johnson's testimony to the effect that he was not frightened, negatived any conclusion that the act of placing the knife against Johnson was unlawful, and that the only reasonable conclusion which could be drawn from the evidence was that accused was merely playing and that there was no intent to injure or harm Johnson. The testimony of the accused, as colored by Johnson's statement that he was not afraid, might negate any unlawful intent on the part of the accused as to this one incident; but there were other surrounding facts and circumstances from which the members of the court-martial could reasonably have concluded that there was an unlawful intent to injure, dependent on Johnson's conduct. When he entered the tent, accused acted belligerently and abusively toward Arline. He demanded that Arline procure a pass for him, and brandished a knife at Arline in an effort to emphasize his desire that the victim comply with his request. After that, he immediately turned toward Johnson, demanding to know whether the latter was friendly with him or not. A false move or an unsatisfactory answer might have caused the accused to use the knife as he did on other victims. While accused was holding the knife against Johnson, Ferwerda and Arline started to leave the tent and accused immediately grabbed Ferwerda, and after his short altercation with him he again assaulted Arline, this time cutting him twice on the wrist. In order to accept accused's explanation of his actions toward Johnson the members of the court-martial would either have to ignore the substantial evidence of his conduct both

before and after he assaulted Johnson or take a most unusual and absurd view that accused was only playing. While individuals who have been drinking quite often exhibit unusual behavior, the court-martial was not required to find that belligerency changed to friendly playfulness and back to belligerency again within the period of a very few minutes. By their finding, the court-martial members rejected accused's explanation, and in the light of all the circumstances we cannot hold their conclusion unreasonable.

The next question concerns the sufficiency of the evidence to support the finding that the accused assaulted Pfc. Darter. The evidence establishes that Darter was sitting on his bed writing a letter when accused entered the tent and struck him on the back of the head. The circumstances and facts related reveal no hostility or provocation on the part of the victim. When accused asked for a match, Darter replied that he did not have one. The accused then told Darter he had better obtain one quickly, again striking him. As Darter rose from the bed and turned around, the accused pulled a knife out of his pocket and thrust it at the stomach of Darter, who jumped back away from accused. The accused then stated that "[I] ought to cut your head off," and made menacing motions with the knife within about half a foot from Darter's throat. Darter testified that he was frightened and that he finally managed to pick up his carbine, work his way around the accused, and leave the tent.

Here the facts and circumstances clearly place the offense within the category described as an act putting the other in reasonable fear of immediate bodily harm. Darter testified as to his fear. There was present an ability on the part of the accused to injure the victim and an apparent intention to use the knife in a manner likely to cause serious injury to the victim.

As to the finding on the specification alleging that accused committed an assault upon Pfc. Ferwerda, defense counsel contend that the evidence does not establish an overt act since it fails to show that accused made any motion toward Ferwerda with the knife. In support of this specification the evidence shows that at the time of this assault the victim was in the act of leaving the tent, and was walking away from the accused. The latter grabbed his shirt collar; and as Ferwerda turned he observed that accused had a knife in his hand which was not more than 12 inches away from Ferwerda. The victim then grabbed and held the assailant's arm. A few minutes previously Ferwerda had witnessed accused's attack upon Sgt. Johnson and had seen the accused strike twice at Pvt. Arline. He testified that he was frightened by the actions of the accused, and his apprehension of immediate bodily harm is further evidenced by his securing a carbine as quickly as possible to provide some adequate protection against his assailant. In considering all of the evidence, reasonable minds could have concluded that Ferwerda's act of prevention in grabbing the arm of accused was the principal factor in avoiding his immediate personal injury. Concededly, there is no evidence that the knife touched the victim, but the record contains circumstances from which the attempt to injure may be inferred. Accused grabbed Ferwerda by the collar with one hand, with the knife poised in the other close to Ferwerda, indicating an intent to strike. There was some motion which indicated to Ferwerda that he had to grab the arm of the accused to prevent injury. It is apparent that accused was within striking distance of his victim. His actions and attitude and the general overtone of his behavior during the entire period that he was in the tent indicated an unfriendly, abusive and threatening state of mind with utter disregard for the rights of others. On the other hand, the acts of Ferwerda show an attempt on his part to avoid, if possible, any contact with the knife. To avert any further trouble, and to prevent injury to himself, Ferwerda, after releasing his hold on the accused grabbed a weapon to protect himself. From these circumstances, the members of the court-martial could reasonably find that the only break in the chain of circumstances which prevented the con-

summation of a battery was Ferwerda's preventive behavior.

One further contention has been advanced as to the specifications. It is contended that the knife as used by the accused was not a dangerous weapon. The dangerous character of the weapon employed in an assault is ▬▬ tested not only by the weapon itself, but also by the manner in which it is used. See paragraph 1801, page 247, Manual for Courts-Martial, U. S. Army, 1949. In the instant case the instrument alleged to have been employed in the offenses was a knife, which was admitted in evidence. Under the facts of this case and the manner in which the ▬▬ knife was used, we have no hesitancy in holding that the court-martial was well within the bounds of reason in holding the assaults were committed with a dangerous weapon.

While we have taken the trouble to test each of the specifications for sufficiency of the evidence, a conviction of any one would support the sentence. Although it may appear that the assaults were closely related and that the accused should not have been punished excessively for four offenses we believe the court-martial in imposing punishment treated them as one. The maximum punishment for absence without leave in Korea is confinement for life and the punishment for each assault with a dangerous weapon is 3 years confinement. Each offense permits a dishonorable discharge. The view the court-martial took of the offenses is spelled out in the sentence of only one year's confinement accompanied by a dishonorable discharge.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.