UNITED STATES, Appellee

v.

WENDELL L. SMITH, Private E–1, U. S. Army, Appellant

4 USCMA 41, 15 CMR 41

No. 2642

Decided March 26, 1954

MAJ Edwin Doran, U. S. Army, and 1ST LT Richard B. Dempsey, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Roderick V. Brown, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused was tried by general court-martial under a specification alleging assault with a dangerous weapon, in violation of the Uniform Code of Military Justice, Article 128(b)(1), 50 USC § 722. He was sentenced to receive a dishonorable discharge, to total forfeitures, and to confinement at hard labor for one year. The findings and sentence were affirmed by intermediate reviewing authorities, and we have granted the accused's petition for review in order that we may determine

the sufficiency of the evidence to support the conviction.

## II

During a football game between two Army units in Bamberg, Germany, the accused and one Siford—both participants in the match—engaged in an argument. Their disagreement began with a charge by the accused that Siford had struck him in the course of a previous play. This accusation Siford denied—whereupon a physical encounter took place. Other soldiers separated the combatants and attempted to quell the fray. The accused, however, seems to have entertained a contrary intention, and extracted from his clothing a pocket knife with a blade approximately five inches in length. With the blade "pointing out . . . he just swung it back and forth to clear the people away from him." Next—after uttering an obscene threat in Siford's direction—the accused moved toward the former with the open knife in his hand. Siford testified that at this point he and the accused were "approximately ten yards apart." He added that, after the accused had taken "two or three" steps, he—Siford—"started getting off the football field." This flight Siford explained by saying that he "was not too ambitious to stay there and wait on him [the accused]" because he "didn't know whether he [Smith] was going to use it [the knife] or not." During the course of his testimony, Siford eventually concluded that he had in fact been afraid. Other witnesses recounted that "Siford was moving out," with the result that the accused narrowed the original gap only slightly, if at all. Apparently the accused had advanced only a few yards in Siford's direction before halting in compliance with an order shouted by a lieutenant who had chanced to witness the entire episode. The sole defense witness was one Private Brooks to whom the accused had delivered his knife immediately after the altercation. Brooks had promptly thrown it into a nearby vacant lot.

## III

The question presented on this appeal is whether—in view of the several yards' distance which at all times separated the participants—a finding of aggravated assault is sustainable. Indeed, defense counsel have gone further and have urged that, by reason of this distance, the evidence failed to support a conviction of even simple assault. This contention they support by reference to the statement in the current Manual for Courts-Martial that "To aim a pistol at a man at such a distance that it clearly could not injure would not be an assault." Paragraph 207*a*. Brandishing a knife, counsel insist, is no assault until the assailant is near enough to the prospective victim that the latter might be injured.

We deem more apposite for present purposes a preceding passage in the Manual, which states:

"If there is a demonstration of violence coupled with an apparent ability to inflict bodily injury, so as to cause the person at whom it was directed reasonably to fear such injury unless he retreats to secure his safety, and under such circumstances he is compelled to retreat to avoid any impending danger, the assault is complete, even though the assailant may never have been within actual striking distance of the person assailed." [Paragraph 207*a*.]

This statement clearly exempts the crime of assault from any requirement that, in every case, the aggressor be within "actual striking distance" of the object of his disfavor. Although an interval of roughly ten yards separated the accused from Siford at all times, the former seems to have enjoyed a clear path to his target. In light of the accused's visible possession of a cutting weapon, and because of his evinced hostility, we can scarcely consider the evidence insufficient to show that Siford reasonably feared injury unless he retreated to secure safety. After all, ten yards may on occasion be traversed with amazing celerity. Within the Manual's clear intendment, Siford was "compelled to retreat to avoid" the impending danger of being harmed by the accused's blade.

Several civilian jurisdictions demand proof of a "present ability" to injure in order to sustain a conviction in this sort of case. Accordingly, they do not regard the direction of an unloaded pistol at another as an assault—this on the reasoning that a "present ability" to inflict injury is lacking. Parenthetically we may observe, however, that, even within the confines of this doctrine, it might rationally be found that an enemy with a knife was sufficiently near his victim at ten yards to be guilty of assault—this quite apart from the possibility that the knife might be thrown. In any event, the Federal courts have rejected the limitations of "present ability," and hold that the aiming of an unloaded pistol may constitute an assault. Price v. United States, 156 Fed 950 (CA 9th Cir). The Manual for Courts-Martial prescribes the same result. Manual, supra, paragraph 207a. And its draftsmen have indicated clearly their wish to follow the Federal rule in the matter. See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 284. One textwriter explains the rationale of this position as follows:

"There is no need for the party assailed to be put in actual peril, if only a well-founded apprehension is created; for his suffering is the same in the one case as in the other, and the breach of the public peace is the same." [2 Bishop, Criminal Law, 9th ed, § 32.]

and judicial opinions have commented:

"It is the outward demonstration that constitutes the mischief which is punished as a breach of the peace." [Commonwealth v. White, 110 Mass 407.]

"We have a right to live in society without being put in fear of personal harm. But it must be a reasonable fear of which we complain. And it surely is not unreasonable for a person to entertain a fear of personal injury when a pistol is pointed at him in a threatening manner, when, for aught he knows, it may be loaded and may occasion his immediate death. The business of the world could not be carried on with comfort if such things could be done with impunity." [Beach v. Hancock, 27 NH 223, 59 Am Dec 373.]

Proper respect for the policies underlying the Federal rule, which has been adopted for the military services through the Manual, directs the conclusion that the court-martial in this case was justified in believing that the accused had committed an assault. When we consider the infringement of Siford's right to be safe from attack, we must conclude that the proximity of the accused was such as to reduce to a practical zero the feeling of security he was entitled to enjoy. That Siford himself was put in fear is both understandable and undeniable. It must have been quite clear to him that the accused was not engaged in play. In light of the modest distance between them and the total absence of obstacles to the accused's progress, Siford would have been foolhardy indeed had he relied on the possibility that the accused was acting in jest, or that he would depart from his avowed purpose. If—as we believe—there exists a right to go about one's daily affairs free from compulsions either to deviate therefrom at another's whim, or to take refuge in humiliating flight, such a right would be mocked indeed were we to reject the notion of assault in the instant case. Moreover, the law exists in some degree to prevent breaches of the peace and promptings to resort to self-help. In our view, accused's conduct here was sufficiently menacing to produce more than a fair risk that a victim might seek to utilize force as a measure of self-protection—with the resultant possibility that, contrary to the purpose of the law, a serious affray might develop.

We must confess to little enthusiasm for the idea of shielding an assailant for the reason that he was not fleet enough of foot to overtake his intended victim. Yet to such a result would the defense position commit us. It will be recalled that, under its view, no "present ability" exists to cut or to strike a selected victim who is sufficiently agile to remain out of striking range. Indeed, such an approach operates to place a premium on the strength and repu-

tation of the assailant as a bully-boy—a ruffian. If he is puissant enough to force others to flight at his approach—prepotent enough to cause others to avoid his range of effective harm—he may practice his aggressions without let or hindrance. Our determination, on the other hand, is that such interferences with the right of others "to carry on the business of the world with comfort," are not to be tolerated under military law.

The defense emphasizes that there is little evidence showing without equivocation that the accused ▇▇▇▇▇ ▇ genuinely undertook pursuit of Siford, once the latter determined on flight. Perhaps—if it is true—this was attributable to the speed with which Siford departed the playing field. Perhaps, too, it was due solely to the fortuitous presence of an officer whose command was heeded by the accused. At all events, we deem this possible absence of hot pursuit to be immaterial under the facts of this case. The Supreme Court of Arkansas considered a similar problem in passing on a conviction for assault by threatening with a knife. There, as here, the accused was never within striking distance of his prey. Likewise, the victim in that case, upon a show of violence by the assailant, immediately retreated to safety. No pursuit whatever took place. The court observed that:

"Appellant did not attempt to follow Calhoun as he ran away. But it was not necessary that he do so to constitute the offense of a simple assault. The law on that subject is designed to preserve the peace and to prevent acts of violence and the putting in fear of violence. . . . Appellant will not be permitted to say that Calhoun's observance of the law made it impossible for him to break it. This law should be sufficient to protect one from the humiliation of being compelled to retreat, but if not, then it punishes that person who forces another to do so to prevent the infliction of a bodily injury." [Wells v. State, 108 Ark 312, 157 SW 389.]

We are quite without disposition to question the determination of the court-martial that Siford did not act unreasonably in expressing apprehension for his safety, and in seeking to preserve himself through flight. Certainly the amenability of the accused's aggression to punishment is not to be evaluated in in inverse ratio to its success in directing its victim from the prosecution of normal pursuits and forcing him to flee for his life. Instead—to put the matter somewhat extravagantly perhaps—the law has provided Siford here with assurance that the humiliation of his flight—a wholly reasonable, and perhaps necessary measure of self-protection—will not go unavenged by society.

## IV

If, then, the accused may be said to have committed an assault upon Siford, did his misconduct amount to an aggravated one—the offense of which he has been found guilty? The Uniform Code, Article 128(b)(1), proscribes as an aggravated assault one committed "with a dangerous weapon." At first blush, we are sure, a knife containing a blade some five inches in length would seem to fall within the "dangerous weapon" category. Yet the Manual tells us that "A weapon is dangerous when used in such a manner that it is likely to produce death or grievous bodily harm." Paragraph 207b(1). There is no evidence here to indicate that the accused contemplated using the knife as a missile. Moreover, the testimony indicates that at all times the assailant was separated from his victim by a distance of no less than, say, nine or ten yards. Thus our question becomes: was a knife, when used as a cutting instrument, a "dangerous weapon" under the circumstances of this case? The defense contends that it was not—and may never be so considered, so long as a prospective victim remains out of thrusting range. On the other hand, the court-martial found that the knife was used as a "dangerous weapon." Consequently unless we are able to arrive at a contrary conclusion as a matter of law, the findings must be affirmed. We cannot so hold.

We must register dissent from the position that an open long-bladed knife in the hand of an oncharging attacker

**45**

may not constitute a "dangerous weapon" solely and only because the assailant has not yet reached his target. In addition, we distinctly suspect that, had we regarded the knife—from Siford's location and at the time in question—we would quite readily have formed an on-the-spot judgment to the effect that the accused was armed with a "dangerous weapon," and that he was proposing to use it as such. Finally, we encounter difficulty in comprehending, as a practical matter, why Siford's fleetness of foot should protect the accused from a conviction for aggravated assault any more than from one for the simple offense.

Admittedly the gravamen of aggravated assault is less preoccupied, than that of simple assault, with the victim's reasonable apprehension of injury—as distinguished from the assailant's actual ability to inflict harm. That this should be so as to the type of aggravated assault with which we are dealing here is—from a functional point of view—distinctly open to debate. However, regarded in terms of history, the problem is not an open one so far as we are concerned. Indeed—and in accord with the rule of the Price case, supra—the Manual has indicated that, although the act of aiming an unloaded pistol at another constitutes a simple assault, it does not amount to an aggravated one. Paragraph 207b(1). This distinction may perhaps be criticized with soundness for its failure to accord due attention to the apprehension entertained by the victim—quite apart from the presence or absence of ammunition in the weapon's chamber. Certainly the assailed person would be afforded a basis for greater apprehension in the case of the pistol wielder than in one in which he is approached by an attacker armed with nothing more lethal than bare fists. Yet to reach a different result would constitute a laborious task within the framework of Article 128(b)(1). This is true for the reason that, under Manual language, it is difficult to interpret an unloaded pistol—used neither as a bludgeon nor a missile—as a "dangerous weapon," since under every conceivable circumstance it lacks any sort of power to inflict injury.

46

The principles involving an assault with an unloaded pistol, however, are wholly inapplicable to the case at bar. By way of illustration, had the accused brandished an unloaded pistol, rather than the knife he did, when he advanced upon Siford, he could not—still under Manual language—have been guilty of attacking the former with a "dangerous weapon," and thus could not have been guilty of aggravated assault. This result would obtain, be it noted, regardless of the factor of distance—that is, whether the accused and Siford were ten feet apart or ten miles, or, for that matter, were standing toe to toe. Yet when, for the unloaded pistol, we substitute a knife, we meet a different problem, and one in which the victim need not consider whether the weapon is "unloaded" or the reverse. Indeed, the defense concedes that, with sufficient proximity, a knife may become a dangerous weapon. Under its criterion, therefore, the test is one of distance. We quite agree that distance may be a factor—but we deem any requirement of distance to have been met in the case at bar, since we have seen that the physical relation between the accused and Siford was sufficiently proximate to cause a reasonable man to flee.

In point of fact, we view the element of distance in the setting of this case as affecting not the dangerous character of the weapon—the ingredient of aggravation in these cases—but the very existence of any assault at all. "To aim a [loaded] pistol at a man at such a distance that it clearly could not injure would not be an assault." Manual, supra, paragraph 207a. Similarly, to brandish a knife from afar, without effort on the part of the aggressor to establish contact with the person allegedly assailed, would fail in most cases to constitute any sort of assault, simple or aggravated. Yet, once the prospect of uninvited contact develops to the point at which a reasonable man would feel compelled to retreat, we believe that an assault has been committed. And if that prospective contact assumes the form of a cutting or stabbing with a knife—in most uses a dangerous weapon—we conclude that an aggra-

vated assault has been committed. The form of the foreseeable contact—that is, whether it in fact involves a means likely to produce "death or grievous bodily harm"—is the determinant as to aggravation. The element of distance is material in these premises only in deciding whether any assault was committed.

These conclusions, we believe, are in no way inconsistent with Manual language. It is true, of course, that "A weapon is dangerous when used in such a manner that it is likely to produce death or grievous bodily harm." Yet we are also told that "When *the natural and probable consequence* of a particular use of any means or force would be death or grievous bodily harm, it may be said that the means or force is 'likely' to produce that result." Paragraph 207b(1). (Emphasis supplied.) We certainly cannot say that the court-martial here was unjustified in its finding on the evidence before it that the use of his knife by the accused rendered harm to the accused "likely." To put the matter otherwise, and perhaps more specifically, we cannot at all hold that the court was wrong in believing that a "natural and probable consequence" of the accused's conduct—that is, one "likely" to eventuate in the absence of external interruption—was grievous bodily harm to Siford. We are quite undisturbed by the statement in the same source that "an unloaded pistol, when presented as a firearm . . . is not a dangerous weapon, means or force." This is undeniably true for the reason that, since under no conceivable circumstances is it capable of injury, its use is not "likely to produce death or great bodily harm."

## V

In summation—and viewing the matter from a somewhat different standpoint—the following may be said. Two principal approaches to the problem of assault are possible. The first of these is that of "present ability." This approach is entirely objective in nature, and it regards the phenomena of the situation solely from the point of view of the assailant. The second, is em-

bodied in the idea of "apparent ability." It, on the other hand, is essentially *subjective* in character, and scrutinizes the data of the case through spectacles directed at the victim—at him who is assailed. Although substantial authority exists in this country which supports each position, there can be no doubt about the choice of the Manual for Courts-Martial in the premises. It has adopted the latter—that is the test of "apparent ability."

As a matter of sheer logic, it may be said to follow that, if we are to view the question of bare assault through the eyes of the victim, so also should we measure that of aggravation. However, the Manual has departed from the method of logic in at least two instances. One of these has to do with simple assault itself, and the other with aggravation. We are told that "To aim a pistol at a man at such a distance that it clearly could not injure would not be an assault." The approach here cannot be a subjective one, for there is wholly left out of account the possibility of genuine apprehension on the part of the target based on his ignorance of the nature of the weapon used and its effective range. In addition we are informed that "an unloaded pistol, when presented as a firearm . . . is not a dangerous weapon . . . and this would be so whether or not the assailant knew it was unloaded." This, of course, is unqualified objectivity, for it entirely omits the possible presence of reasonable apprehension.

Which of these inconsistent principles shall we adopt in the disposition of the instant case? To put the question in rhetorical terms, shall we choose the Manual's overriding logic or instead elect to follow its limiting illogic? We discern no policy directing the latter course. Indeed, we believe we see one pointing in the contrary direction. Moreover,—and quite apart from policy of any nature—we have experienced no difficulty in distinguishing from the present case the Manual's illustration involving an unloaded pistol. This we have sought to demonstrate earlier in these pages, and—in the sphere of aggravation—have derived manifest analogical support from the Manual's fur-

ther illustration, dealing with simple assault, and having to do with an assailant who—stockstill—aims a loaded pistol from afar.

It is clear that we are precluded by the express provisions of the Manual from accepting the defense position on the issue of assault—for the plain reason that the test of "apparent ability" has been expressly laid down for the military services. However, there does exist a simple theory—however sterile and uncritical—by which its views on the question of aggravation may be adopted. Under this analysis we would rationalize about as follows. Although the Manual has elected to follow the subjective thinking of "apparent ability" in the area of simple assault, it has not done so in that of aggravation. There it has adopted the objective approach of "present ability." Ours not to reason why. It follows that—so long as several yards separated the accused from Siford in this case—the former could not actually harm his victim with an unthrown knife. And from this it follows in turn that the court-martial erred as a matter of law in deeming the knife a "dangerous weapon," and resultantly in finding the accused guilty of aggravated assault. This handling of the problem is much too naive and for the reasons which have been developed herein, it cannot be approved.

### VI

From what has been said, it must be apparent that we cannot say that the court-martial could not reasonably have reached a finding that the accused was guilty of aggravated assault. Cf. State v. Barella, 73 RI 367, 56 A2d 185. The instructions of the law officer on the offenses charged were extensive, and adequately guided the court in determining whether the accused was near enough to Siford to be guilty of aggravated assault. Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

I have no difficulty with the majority opinion so long as it concerns itself with developing the reasons why a simple assault was committed in this case. It must be conceded that the present Manual has adopted an "apparent ability" test rather than a "present ability" test to determine whether the lesser offense has been committed. We have previously interpreted the provision found in Manual for Courts-Martial, U. S. Army, 1949, paragraph 180k, page 244, which was couched in the same general terms to that effect. United States v. Norton, 1 USCMA 411, 4 CMR 3. For reasons set forth hereinafter, however, I cannot accept the proposition that the evidence is sufficient to support the offense of aggravated assault.

The majority opinion concedes that a knife is not dangerous per se and that it only becomes dangerous when used in a manner which is likely to produce death or great bodily injury. The Manual defines a dangerous weapon in the following terms (paragraph 207b, page 372):

"Assault with a dangerous weapon.—A weapon is dangerous when used in such a manner that it is likely to produce death or grievous bodily harm. By 'grievous bodily harm' is meant serious bodily injury. When the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm, it may be said that the means or force is 'likely' to produce that result. . . .

"With respect to the offense of aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm, it is not necessary that death or grievous bodily harm be actually inflicted."

The court-martial found that the knife was used in such a manner as to be a dangerous weapon; so unless I arrive at a contrary conclusion, as a matter of law, I agree the findings must be affirmed. The problem is thus reduced to the meaning the framers of the Manual intended to give to the word "likely." This word is usually defined as of such a nature as to render something probable and the Manual quotation adopts such a definition. While simple

48

assault should not be determined by distance, it is obvious that proximity may be a factor in determining probable injury. A loaded gun, when the victim is out of range, is not dangerous, and while the intervening space can be reduced, the weapon is harmless until its potentialities for harm can be made effective. Burks v. State, 145 Tex Cr R 15, 165 SW2d 460, 463 (1942); State v. Simon, 247 P2d 481, 483–484 (Mont 1952). Likewise, a knife is not dangerous unless the parties are so close that it is likely injuries can be inflicted by the manner in which the knife is used.

Each case must depend upon whether the particular use of the weapon renders likely a serious result. As stated by the majority opinion, there is no evidence to indicate that this accused intended to use the knife as a throwing instrument. Had the evidence shown that method of employment, then injuries might have probably resulted, but here the parties were never in close enough proximity so that it could be concluded reasonably that the act of the accused in flourishing the knife would likely produce death or great bodily injury to the victim. United States v. Salisbury, Fed Cas No. 16,214 (1843).

The majority of this Court and I part company on more than just the facts of this case. There is an erroneous idea in the majority's reasoning, and it merits more than mere mention. The principal opinion seems willing to insist that only two possibilities are present. Either a weapon must be incapable of causing injury under any conceivable circumstances or else the weapon is "likely" to produce death or grievous bodily harm. I am of the opinion that at least a third alternative is present. To my mind, and as a matter of law, it might be *possible* to cause injury with a weapon under certain circumstances; yet it might not be *likely* that injury

would be caused. Moreover, I recognize a clear distinction between a weapon incapable of causing injury under any conceivable circumstances and a weapon with which injuries might *possibly* be inflicted under certain circumstances. On the facts of this case, if I were driven to accept one of the two alternatives offered by the majority opinion, I would be willing to hold that no reasonable man would believe that a knife which was not used as a missile is capable of inflicting injury when brandished at a distance of ten yards.

It is, I believe, more than mere coincidence that the majority opinion does not cite a single authority to support its conclusion that assault with a dangerous weapon is supported by the facts of this case. Price v. United States, 156 Fed 950 (CA 9th Cir), is a case where only simple assault was affirmed by the court. In Wells v. State, 108 Ark 312, 157 SW 389, the defendant was indicted for assault with intent to murder, but convicted of a mere simple assault. The case of State v. Barella, 73 RI 367, 56 A2d 185, represents a correct result and well illustrates why the evidence is insufficient in this case to make out assault with the dangerous weapon. In that case the defendant swung at the victim with a large shovel and missed striking his victim on the head by no more than an inch or two. Contrast that case with this, where accused waved a knife having a five inch blade at a distance of thirty feet from the victim.

I conclude that the evidence is insufficient to sustain the offense found, but sufficient to support the lesser included offense of assault. I would return the record of trial to The Judge Advocate General of the Army for reference to a board of review for appropriate action.