UNITED STATES, Appellee

v

JOHNNY ACOSTA-VARGAS, Recruit, U. S. Army, Appellant

13 USCMA 388, 32 CMR 388

389

No. 15,915

December 21, 1962

*First Lieutenant Robert L. Brosio* argued the cause for Appellant, Accused. With him on the brief was *Captain Richard A. Baenen.*

*Captain Carl F. Wrench* argued the cause for Appellee, United States. With him on the brief was *Major Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Convicted by general court-martial for assault with a dangerous weapon, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928, accused was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for twelve months. The convening authority and a board of review affirmed such findings and the adjudged punishment. However, the Acting The Judge Advocate General of the Army took action to remit accused's sentence in part. As a result of such order accused's term of confinement was reduced to six months, the forfeitures to $52.00 per month for the same term, and the discharge was suspended with provision for automatic remission. Subsequently this Court granted accused's petition for review on a single issue relating to the law officer's instructions on self-defense.

Accused, a native of Puerto Rico, and not yet at that time eighteen years of age, was stationed in the continental United States for training. He apparently experienced some difficulty with the English language; in fact, we note the services of an interpreter were utilized throughout the trial. Likewise, it would appear that he experi-enced some problem—emotional or otherwise—in adapting himself to life in the military away from his former environment. Indeed, due to prior difficulties, he was, on the evening in question, a prisoner in the segregation building of the stockade at Fort Jackson, South Carolina. The alleged victim, one Private First Class Shaw, was a guard and, in the course of his duties, he observed the accused tearing up his clothes. Accordingly, Shaw had accused place his clothes outside the cell. To that point, the stories of the parties are in agreement but, as to subsequent events, they vary markedly.

The Government's evidence indicates accused attacked the guard, then broke loose as the latter grappled with him attempting to keep him in the cell. Accused ran to the front of the building. There the supervisor of the guard shift, Goudreau—to whom Shaw had called for assistance in obtaining the clothes, and who observed a scuffle but no blows between the pair—attempted to intercept accused and restrain him. The prisoner was also successful in breaking away from him, however, and having done so, obtained a long dagger-like shard of glass from a broken window-pane in the door. Thereupon the supervisor, in an attempt to avoid a

serious incident, directed Shaw to leave the building and take up another post. In complying, Shaw passed behind Goudreau, and at that point accused "charged" toward him, holding the broken glass in knife-like fashion. Shaw exited the building, ran through the gate and closed it. Accused stopped his pursuit only when Shaw was on the far side of the gate. Thereafter, Goudreau and one Miley, who had come on the scene, disarmed accused. Shaw expressly denied provoking accused, striking him, or at any time having removed his pistol belt, which testimony is corroborated by that of the other witnesses for the prosecution.

According to the version asserted by accused, on the other hand, Shaw entered the cell and, without provocation, struck him in the mouth. The guard also grabbed accused around the neck and, when the latter resisted by attempting to remove Shaw's hand, threw accused to the floor. In order to avoid a beating, therefore, accused testified he ran from the cell and to the front of the building. He claimed Shaw pursued him with a pistol belt in his hand. Goudreau, who is larger than accused, stopped him, and Shaw punched him in the stomach. It was at this point, accused said, that he armed himself with the piece of glass. He asserted that Goudreau was still holding him as he did so, and stated he did not attempt to break away to chase or attack Shaw as the latter left. To the contrary, he expressly denied pursuing the guard; he wanted to keep away from him. He testified he "wanted the piece of glass so . . . [that Shaw] wouldn't hit . . . [him] again." The record further shows that although accused was emotionally upset and speaking rapidly in Spanish, he did not resist the action to disarm him after Shaw had departed the scene. And, according to the evidence, despite his opportunity to do so, accused at no time threatened, chased, or attempted to cut anyone else.

Thus, the situation before us shows accused was a prisoner, regularly placed in confinement. He was, accordingly, obliged to remain there, to comply with pertinent regulations, and to respond to appropriate orders. In turn, Shaw's duties as a guard included the responsibility to insure and maintain accused's incarceration, to see to it that accused's conduct conformed with requisite standards, and to enforce discipline. Further, the record reflects that—at least at the outset of this incident—accused was ripping his clothing, and Shaw was engaged in correcting this misbehavior. Beyond question, a guard must be permitted certain leeway in light of the relationship and may use reasonable force in the discharge of his responsibilities. Certainly, a prisoner may not interfere therewith or place conditions on his conformity. See United States v Holiday, 4 USCMA 454, 16 CMR 28. On the other hand, a guard or policeman may not use his position as a shield for unwarranted abuse or other unjustifiable treatment of those under his charge; even a prisoner is entitled, under appropriate circumstances, to resort to force in self-defense. See United States v Gemmell, 23 CMR 696; United States v Barker, 12 CMR 244; 41 Am Jur, Prisons and Prisoners, § 37.

It is apparent that the defense position in the case at bar was predicated on the last-mentioned theory. Thus, although accused conceded in his testimony that Shaw had never struck him with the pistol belt;[1] admitted that Goudreau had merely restrained him and had not held him so that Shaw might hit him; and acknowledged that it was not until after these two events that he armed himself with the shard of glass, the defense proffered three requested instructions on self-defense to the law officer. And, while the law officer charged the members of the court-martial on that subject, the defense here asserts that he erred to accused's prejudice. Specifically, it is claimed the instructions were incon-

---

[1] Accused testified that Goudreau had stopped him. Shaw came up but, even though the belt was in his hands, he hit accused in the stomach with his fist.

391

sistent and confusing, and that they failed to provide the court-martial with a meaningful standard. For a number of reasons we must reject the assignment of error.

Among other items, we note that the law officer included in his instructions the advice "that a person ▓ may lawfully meet force ▓ with a like degree of force in protecting himself." This Court has previously considered the propriety of such an instruction. See United States v Straub, 12 USCMA 156, 30 CMR 156. As was there pointed out, the theory of self-defense is protection, and if excessive force is used against an assailant, the defender becomes the aggressor. Certainly that principle has validity. However, as we also recognized in that instance, the principle does not restrict one to the precise force threatened by the assaulter. Cf. United States v Black, 12 USCMA 571, 31 CMR 157.

Under the circumstances which the majority found in the *Straub* case, it was held there was no fair ▓ risk the court members misunderstood the principle. Manifestly, the same is true here. Thus, in the present instance the law officer took pains to amplify the charge, explaining that this meant one acting in self-defense:

> ". . . may legally take means which to him seem reasonably necessary to protect himself from injury. Furthermore, when protecting himself he need not at his peril choose means for protection which exactly measure and counteract the force used against him nor must he at his peril employ the exact nature of force used against him, that is, knife against knife."

It is clear beyond cavil that the court members were not misled as to the appropriate yardstick, since the import of the law officer's charge was that one acting in self-defense is not limited to the identical force utilized by his assailant. There can be no question, then, as to this portion of the instructions. Indeed, the defense does not contend otherwise.

However, here, as in prior cases, we question the adequacy of instructions mentioning "like degree of ▓ force." We deem it appropriate to take this opportunity to point out that it would be well to discontinue use of that phrase. The portion of paragraph 207*a*, Manual for Courts-Martial, United States, 1951,[2] upon which the questioned instruction is evidently grounded, relates to a question of substantive law and not to a matter of procedure or mode of proof. See United States v Smith, 13 USCMA 105, 32 CMR 105. Further, we note that the specific language limiting the force employed in self-defense to a "like degree of force" appears in the 1951 Manual for the first time. No preceding Manual contained the same, and no other authority using that precise phrase has been called to our attention. With marked unanimity we find the rule to be stated, substantially, that the force to which one may resort in self-defense is that which he believes on reasonable grounds to be necessary, in view of all the circumstances of the case, to prevent impending injury. See, generally, 4 Am Jur, Assault and Battery, § 50; 6 CJS, Assault and Battery, § 92; Miller, Criminal Law, § 67, at pages 200 and 206 (1934); Perkins, Criminal Law, page 885 (1957).

In our opinion, instructions on self-defense going no further than that a person may meet force with a like degree of force, may not necessarily give the court-martial an adequate standard by which to measure the actions of the accused. That language, by itself, does not precisely state the general concept involved, and it warrants amplification. Indeed, even though the decision in United States v Straub, supra, was not unanimous, all Judges were in agreement that far. Thus, a careful reading of the opinion will reveal that even the majority suggested elaboration was in order, but

---

[2] "With respect to the excuse of self-defense, a person may meet force *with a like degree of force.* . . ." [Emphasis supplied.]

found the instructions as a whole adequate to give the triers of fact the proper standard for measuring the actions of the accused. 12 USCMA at pages 159, 160. So, too, in the earlier case of United States v Weems, 3 USCMA 469, 13 CMR 25, after alluding to "like degree of force," the opinion of this Court went on to explain that in evaluating the extent of force utilized by the accused, the respective size of the combatants, and their pugilistic ability, among others, were factors properly to be taken into consideration by the triers of fact.

We strongly recommend that the language "with a like degree of force" be eliminated from instructions to the court-martial in future cases. Under the better practice the charge given to the triers of fact should, in appropriate language,[3] convey the principle to which we have alluded previously herein. That is, although a defender may not use such force as to become the aggressor, he is not limited to the exercise of precisely identical force or degree thereof as is asserted against him; rather, he may employ such not inordinate means as he believes on reasonable grounds necessary for protection against the impending harm under the circumstances.

Turning our attention to another facet of the law officer's charge, we note that later therein he instructed on the possibility that the accused might resort to use of a deadly weapon to deter an attack even though he did not fear death or great bodily harm at the hands of his assailant. That is, he covered the theory here asserted by appellate defense counsel: that, for the purpose of frightening his assailant, one might threaten to resort to more force than he may permissibly, under the law, actually employ in self-defense. See United States v Johnson, 25 CMR 554; American Law Institute, Restatement of Torts, Defenses of Person, etc., § 70; 4 Am Jur, Assault and Battery, § 50,

supra. See also United States v Black, supra, page 575. Thus the law officer instructed that the accused, even though not fearful of death or serious injury at the hands of his attacker, might resort to the use of a dangerous weapon, such as a shard of glass, "as a deterrent but he may not actually commit a return assault by attempting to strike his assailant with such a weapon or by using it aggressively so that his assailant reasonably fears he will immediately be seriously injured or killed by it."

The defense here assails that instruction, asserting the law officer erred in injecting apprehension on the part of the alleged assailant as a factor limiting the extent of accused's action in self-defense. In short, we are told the law officer used Shaw's state of mind, rather than accused's, to govern the critical question of whether accused used the shard of glass merely as a deterrent and not as an aggressive weapon.

As to this argument, we point out that Shaw's apprehension became a factor in the instruction only in the event of *aggressive* use of the broken glass by accused. Moreover, the law officer later in his charge apprised the court-martial that accused was, as a matter of law, entitled to use the weapon to hold his assailant or assailants at bay; that accused was justified in employing the glass as a deterrent so long as he did not use it in an attempt to take life or inflict grievous bodily harm. Again, considering the whole of the instructions on the point, we are satisfied an appropriate yardstick was given to the triers of fact.

We are also urged to hold not only that the law officer's instructions on self-defense were confusing, but that they were partisan as well. While his advise to the members of the court on that subject was indeed somewhat long, we cannot agree that it is subject

---

[3] Our discussion of the concepts here involved is, of course, necessarily general. We do not purport to lay out herein a model instruction appropriate for use in all self-defense cases. Proper advice to the triers of fact should, in all instances, be tailored to the specific facts presented. See our further comments on this matter, *infra*.

to criticism on those grounds. To the generalized allegation that the charge was a hopeless muddle of confusion, we deem it sufficient to state merely that our perusal of the same indicates that the law officer diligently endeavored to give appropriate instructions on all aspects of the question. Neither do we perceive wherein he transgressed the bounds of impartiality. In this connection we pause to mention that the law officer gave the three instructions requested by the defense, referred to earlier in this opinion, almost verbatim. We are satisfied that, taken together, the instructions provided fair and satisfactory guideposts. And we note the record indicates that at trial the defense made this same evaluation of the law officer's instructions. The construction accorded his advice by the parties at trial is, of course, entitled to weight in assessing such an issue on appeal. See United States v Johnson, 3 USCMA 447, 454, 13 CMR 3. Moreover, we invite attention to the fact that the law officer admirably took pains to tailor his advice to the peculiar situation presented by the facts of the case before him. See, in this connection, Department of the Army Pamphlet No. 27–9, Military Justice Handbook: The Law Officer, April 1958, page 5 and especially page 145. See also United States v Acfalle, 12 USCMA 465, 31 CMR 51. He is to be commended for his efforts in this regard.

The real heart of this case was recognized by defense counsel, when he observed at trial, in agreeing no lesser offense was in issue:

". . . [W]e are admitting he is guilty if they believe the prosecution's witnesses, or he is innocent of [sic] they believe the accused. . . ."

Such would indeed seem to be the case. Although accused admitted arming himself with the glass, according to him he never used it offensively at all. Moreover, under accused's story passive protection was the very most he was entitled to, for there was no imminent danger to him. That is, Shaw—who had already struck him only with his fist, not the belt—was moving away from accused and toward the gate. On the other hand, if the version recounted by prosecution witnesses is the truth and accused lunged after Shaw with the piece of windowpane as the guard was exiting under Goudreau's order, then the accused was himself the aggressor and was, therefore, not acting in self-defense.

In that connection, in addition to charging them on self-defense and telling the court members accused might use the shard of glass as a deterrent, the law officer instructed them that:

". . . preparation not amounting to an overt act, such as picking up an instrument of force without any attempt or offer to use it against another, does not constitute an assault. . . ."

See United States v Smith, 4 USCMA 41, 15 CMR 41.

Under all the circumstances, we conclude that accused's guilt or innocence, and the theories posed by the defense, were fairly submitted to the court-martial by the law officer.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.