UNITED STATES, Appellee

v.

Brian DEARING, Operations Specialist Seaman
U.S. Navy, Appellant

No. 05-0405

Crim. App. No. 200100291

United States Court of Appeals for the Armed Forces

Argued March 1, 2006

Decided September 18, 2006

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON and ERDMANN, JJ., joined.  BAKER, J., filed a separate
opinion concurring in the result.  CRAWFORD, J., filed a
dissenting opinion.

Counsel

For Appellant:  David P. Sheldon, Esq. (argued); Lieutenant
Stephen C. Reyes, JAGC, USNR (on brief); Philip Sundel, Esq.

For Appellee:  Major Wilbur Lee, USMC, (argued); Commander
Charles N. Purnell II, JAGC, USN (on brief); Captain Glen R.
Hines, USMC.

Military Judge:  Clark A. Price

**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

It is a "basic rule that instructions must be sufficient to provide necessary guideposts for an 'informed deliberation' on the guilt or innocence of the accused."[1]  In this case, the pivotal issue is whether the military judge failed to provide a correct instruction pertaining to Appellant's right to exercise self-defense.  The prosecution evidence presented Appellant as the initial aggressor in a lethal altercation.  But the defense evidence presented actions of members of a hostile group that arguably escalated the conflict, thereby permitting Appellant to use reasonable force to defend himself.  We hold that the military judge erred in failing to instruct the panel on the concept of escalation of the conflict as it relates the issue of self-defense.  This significant defect in the instruction requires us to reverse the decision of the United States Navy-Marine Corps Court of Criminal Appeals.[2]

This is not the only issue presently before this Court.[3]  We also address Appellant's assertion that he was denied a speedy

---

[1] United States v. Anderson, 13 C.M.A. 258, 259, 32 C.M.R. 258, 259 (1962) (citing United States v. Landrum, 4 C.M.A. 707, 713, 16 C.M.R. 281, 287 (1954); United States v. Acfalle, 12 C.M.A. 465, 470, 31 C.M.R. 51, 56 (1961)); see also Anthony v. Louisville & Nashville R.R. Co., 132 U.S. 172, 173 (1889) ("The object of the instructions was to impart such information as would govern the jury in their deliberations and guide to a right conclusion in their verdict.").
[2] United States v. Dearing, 60 M.J. 892 (N-M. Ct. Crim. App. 2005).
[3] This Court granted review on two issues:

post-trial and appellate review.  We hold that Appellant was denied his due process right to speedy post-trial and appellate review and grant appropriate relief.

## I.  FACTS

### A.  General Background of the "Road Rage" Incident

Appellant's alleged offenses arise from his involvement in an on-base "road rage" fight.  The incident implicated Appellant and three friends, riding in two cars, and three victims with four additional friends, also in two cars.  Prior to this incident, neither group knew the other group.  Several of those involved in this incident had been drinking alcohol that evening.  The actual incident lasted only a few minutes.

The lower court identifies the alignment of the adversaries and the circumstances of the fight:

> On the night of 18 September 1999, the appellant, his girlfriend, Teresa Wilson, and two other friends, Fireman (FN) Anthony S. Taylor, U.S. Navy, and his wife, Jennifer Taylor, went to see a movie at the Norfolk, Virginia Naval Base movie theater.  The appellant and his girlfriend went to the movie theater complex in the appellant's black Isuzu Amigo and the Taylor couple went separately in FN Taylor's black Dodge Avenger.

---

I.   WHETHER THE MILITARY JUDGE ERRED BY FAILING TO PROPERLY INSTRUCT THE PANEL REGARDING APPELLANT'S RIGHT AS AN AGGRESSOR TO EXERCISE SELF-DEFENSE IN AN ESCALATION OF FORCE SITUATION.

II.  WHETHER APPELLANT WAS PROVIDED A TIMELY POST-TRIAL AND APPELLATE REVIEW UNDER THE UNIFORM CODE OF MILITARY JUSTICE AND THE UNITED STATES CONSTITUTION.

United States v. Dearing, 62 M.J. 226 (C.A.A.F. 2005).

On that same evening, MM3 Taylor and some of his friends, Aviation Ordnanceman Airman Apprentice (AOAA) Eldridge J. Wells, Jr., U.S. Navy, AOAN Keaton, and MMFN Polydore and his date, Elizabeth Hargrave, saw the same movie at the same theater. AOAA Wells and MM3 Taylor went to the movie theater with AOAN Keaton in his black Honda Accord, which AOAA Wells drove, and MMFN Polydore and his date went separately in MMFN Polydore's tan Mazda Protege. Electrician's Mate Third Class (EM3) Graham Charity, U.S. Navy, and his girlfriend, Aviation Storekeeper Third Class (AK3) Trisha Marshall, U.S. Navy, both friends of MMFN Polydore and MM3 Taylor, were picked up very near the movie theater by MMFN Polydore and his date, immediately after the movie ended.

After the movie, all these individuals left the theater in the same vehicles they arrived in, with the exception of EM3 Charity and AK3 Marshall. Very shortly thereafter, a deadly stabbing incident occurred between the two movie-going parties in the Navy Exchange parking lot near the movie theater.

As a result of what can only be described as a very brief "road rage" incident, partly fueled by alcohol, between some or all of the parties in the Dodge Avenger and the Honda Accord after leaving the movie theater parking lot, those parties shortly thereafter ended up in a verbal confrontation in the Navy Exchange parking lot. For whatever reason, the parties from both the Isuzu Amigo and the Mazda Protege also pulled into the Navy Exchange parking lot immediately following the other two vehicles. After the dust settled, the appellant had stabbed MM3 Taylor to death, and both MMFN Polydore and AOAN Keaton had also been seriously stabbed.[4]

## B. Trial Developments

A general court-martial composed of officer and enlisted members was convened to consider charges against Appellant that included unpremeditated murder, assault with intent to inflict grievous bodily harm, assault with a dangerous weapon (a knife),

---

[4] Dearing, 60 M.J. at 896.

and obstruction of justice.[5]  Appellant pleaded not guilty to all the charged offenses.

At the court-martial, there was extensive testimony regarding the involvement of several members of the group in the fracas.  The trial was essentially a credibility contest that involved "finger pointing" at other people to establish responsibility and culpability for this incident.  In the prosecution case-in-chief, witnesses presented Appellant as both the aggressor and assailant in the fight.  In his defense, Appellant testified and explained his involvement in the incident as his attempt to protect his girlfriend.  Others also testified in support of Appellant's explanation of the incident.

Appellant testified that after his girlfriend got involved in a verbal dispute with the men from the other group, he intervened in order to protect her by pushing the men away with both hands.  Appellant asserted that just as he raised his hands, an unknown person, who was neither his own friend, Anthony Taylor, nor his own girlfriend, hit him in the back of the head.

Appellant further testified that he heard someone ask, "Do you have a gun?"  Appellant stated this statement made him

---

[5] These offenses are punishable under Articles 118, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 928, 934 (2000), respectively.

5

concerned about his safety. Appellant explained that he saw the trunk of the black Honda was open, and he believed that someone had retrieved a weapon from it.

Appellant testified at this point he began fighting to make his way out of the bad situation. As he was fighting with one person, another person was hitting Appellant in the side, and yet another person kicked him. Appellant complained that he was pushed to the ground and grabbed around the neck as another person hit him in the chest.

Appellant testified that he then remembered the knife he had in his pocket, pulled it out, and stuck it out twice in an upward thrust. In summary, Appellant asserted that he was acting in self-defense to save his own life during the brutal attack on him.

At the conclusion of the presentation of the evidence and before the military judge instructed the panel, civilian trial defense counsel asked the military judge to give an instruction addressing the issue regarding escalation of the conflict as it related to the defense of self-defense. Trial defense counsel expressly relied on United States v. Cardwell[6] as authority to support his entitlement to the requested instruction. The record discussion of this issue covers five pages of the record of trial. The discussion ended with the military judge

---

[6] 15 M.J. 124 (C.M.A. 1983).

suggesting that the defense counsel, "Give [him] a piece of paper on what you want."

Complying with this direction, civilian defense counsel proffered the following instruction:

> Even if the accused was an aggressor, the accused is entitled to use self-defense, if the opposing party escalated the level of the conflict. Accordingly, even if the accused was the aggressor, if the opposing party escalated the conflict by placing the accused in reasonable fear that he was at risk of death or grievous bodily harm, the accused would then be entitled to use deadly force in self-defense.

In support of the requested instruction, the defense argued that even if Appellant were the initial aggressor, he was still entitled to rely on the defense of self-defense if the opposing party escalated the level of the conflict.

The military judge refused to give the requested instruction and declined to address the issue of escalation of the conflict. The military judge explained that in his view "the instructions that I have drafted adequately cover the issue." He also opined that "the key explanation is in the definition of aggressor."

The military judge initially instructed the panel on the defense of self-defense. Most relevant to this case, the military judge gave the following instruction to address the issue of Appellant being an aggressor and its implication on the issue of self-defense:

7

> There exists evidence in this case that the accused may have been an aggressor. An "aggressor" is one who uses force in excess of that believed by him to be necessary for defense. There also exists evidence that the accused may have voluntarily engaged in mutual fighting. <u>An aggressor, or one who voluntarily engaged in mutual fighting, is not entitled to self-defense unless he previously withdrew in good faith.</u>

Emphasis added. After hearing this instruction and deliberating, the panel found Appellant guilty of the charged offenses and adjudged a sentence to confinement for twenty-five years, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

### C. Ruling of the Navy-Marine Corps Court of Criminal Appeals

The lower court held that the military judge's instruction to the members substantially covered the issues that the defense requested to be covered.[7] The lower court also concluded that even if the defense-requested instruction had not been substantially covered in the main charge to the members, the military judge's refusal to give the defense-requested instruction on the escalation of violence did not deny Appellant a fair trial because it did not deprive him of a defense or seriously impair its effective presentation.[8]

---

[7] <u>Dearing</u>, 60 M.J. at 899.
[8] <u>Id.</u>

## II. DISCUSSION

### A. Evaluation of Whether the Military Judge's Self-Defense Instruction Adequately Addressed the Issue of Escalation of the Conflict

Rule for Courts-Martial (R.C.M.) 920(e)(3) provides: "Required instructions. Instructions on findings shall include . . . (3) A description of any special defense under R.C.M. 916 in issue[.]" As self-defense is a special defense identified in R.C.M. 916, if this defense was at issue in this case, the military judge was obligated to give a correct instruction on self-defense.[9]

This Court has stated, "The touchstone against which we measure the validity of the military judge's refusal to give an instruction on self-defense is whether there is in the record some evidence from which a reasonable inference can be drawn that the affirmative defense was in issue."[10] In light of Appellant's testimony in the present case, there was "some evidence" to raise the issue of self-defense. Indeed, the

---

[9] See United States v. Martinez, 40 M.J. 426, 431 (C.M.A. 1994) (stating that "the court members were not given a correct legal framework for evaluating appellant's claim of self-defense"); United States v. Jones, 3 M.J. 279, 280-81 (C.M.A. 1977) ("[T]he primary obligation to adequately instruct on a material issue [here self-defense] lies with the military judge."); see generally United States v. Groce, 3 M.J. 369, 370-71 (C.M.A. 1977) (stating that the multiple duties of the military judge include a duty to tailor his instructions to fit the facts of the case).

[10] United States v. Richey, 20 M.J. 251, 253 (C.M.A. 1985) (quoting United States v. Black, 12 C.M.A. 571, 574, 31 C.M.R. 157, 160 (1961), quoting United States v. Ginn, 1 C.M.A. 453, 457, 4 C.M.R. 45, 49 (1952)) (quotation marks omitted).

parties agree that the testimony of Appellant warrants an instruction on self-defense. Therefore, the focus of this appeal is whether the military judge erred by failing to properly instruct the panel on the issue of self-defense.[11]

This Court reviews the adequacy of the military judge's instruction de novo.[12] In United States v. Wolford,[13] we explained:

> If instructional error is found, because there are constitutional dimensions at play, [the appellant's] claims must be tested for prejudice under the standard of harmless beyond a reasonable doubt. . . . The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence.[14]

The military judge generally instructed the panel on the issue of self-defense. The military judge's self-defense instructions

---

[11] As the granted issue focuses on this issue, we do not address the collateral question of whether the military judge erred in not giving the specific instruction requested by the defense. See United States v. Jackson, 15 C.M.A. 603, 613, 36 C.M.R. 101, 111 (1966) (Ferguson, J., dissenting) ("As self-defense was placed in issue, it is necessary, as the granted question indicates, to examine the instructions of the law officer in order to determine their accuracy.").

[12] United States v. Bean, 62 M.J. 264, 266 (C.A.A.F. 2005) ("We review allegations of error involving mandatory instructions de novo." (citing United States v. Forbes, 61 M.J. 354, 357 (C.A.A.F. 2005); United States v. Smith, 50 M.J. 451, 455 (C.A.A.F. 1999)); see generally United States v. Kasper, 58 M.J. 314, 318 (C.A.A.F. 2003) ("The issue of whether the members were properly instructed is a question of law, which we review de novo.").

[13] 62 M.J. 418 (C.A.A.F. 2006).

[14] Id. at 420 (quoting United States v. Kreutzer, 61 M.J. 293, 298 (C.A.A.F. 2005), quoting United States v. Kaiser, 58 M.J. 146, 149 (C.A.A.F. 2003)) (quotation marks omitted).

addressed the following: (1) that Appellant must have had a reasonable belief that death or grievous bodily harm was about to be inflicted upon him; (2) that Appellant must have actually believed that the amount of force he used was required to protect against death or serious bodily harm; and (3) that Appellant is not required to pause at his peril to evaluate the degree of danger or the amount of force necessary to protect himself.

However, the military judge instructed the panel that the Appellant may have been an aggressor. The military judge also defined aggressor as "one who uses force in excess of that believed by him to be necessary for defense." Finally, the military judge explained that a person who is considered an "aggressor" or engaged in mutual fighting, without previously withdrawing in good faith, is not entitled to argue self-defense. The decisional issue in this case arises from a defense challenge to the completeness and correctness of the self-defense instruction.

Appellant argues that the military judge's instructions eviscerated Appellant's case by foreclosing self-defense based on a theory of escalation of the conflict. Appellant asserts that the military judge's instruction incorrectly ignored the principle of law that "Even a person who starts an affray is

11

entitled to use self-defense when the opposing party escalates the level of the conflict."[15]

Cardwell recognized that an initial aggressor is still entitled to use deadly force in his own defense, just as he would be if he withdrew completely from combat and was then attacked by his opponent, in instances where the adversary escalates the level of conflict.[16] In Cardwell, this Court explained, "The theory of self-defense is protection and not aggression, and to keep the two in rough balance the force to repel should approximate the violence threatened."[17]

This Court also explained the concept of escalation of the conflict with this simple illustration: "Thus, if A strikes B a light blow with his fist and B retaliates with a knife thrust, A is entitled to use reasonable force in defending himself against such an attack, even though he was originally the aggressor."[18] At trial the civilian defense counsel expressly relied on Cardwell in requesting an instruction that presented and explained the theory of escalation of the conflict.

In light of Cardwell, we test the adequacy of the military judge's instruction as it related to the Appellant's self-defense claim.

---

[15] Cardwell, 15 M.J. at 126 (citing United States v. Acoste-Vargas, 13 C.M.A. 388, 32 C.M.R. 388 (1962); United States v. Straub, 12 C.M.A. 156, 30 C.M.R. 156 (1961)).
[16] Id.
[17] Id. (quoting Straub, 12 C.M.A. at 160, 30 C.M.R. at 160.
[18] Id.

The instructions, given by the military judge, did not adequately cover the concept of escalation of the conflict.  In our view the military judge failed in his duty to give an "instruction as a whole [that] provides meaningful legal principles for the court-martial's consideration."[19]  In fact, the military judge did not even address the concept of escalation of the conflict.  The military judge compounded this error by giving an instruction that severely limited the military members' ability to consider fairly Appellant's self-defense theory.  The military judge erroneously instructed the panel that Appellant, if an aggressor or a person voluntarily engaged in mutual fighting, was not entitled to self-defense unless he previously withdrew in good faith.

This instruction required Appellant to establish that he withdrew before he used reasonable force to defend himself. Effectively, if the members found Appellant to be an aggressor or one who engaged in mutual fighting, this instruction precluded him from arguing that he had no choice but to defend himself against the escalating violence perpetrated against him. According to testimony offered by the defense, Appellant was hit, kicked, beaten, and knocked to the ground so that he was not in a position to retreat because of the attack on him.  In

---

[19] United States v Smith, 8 C.M.A. 582, 584, 25 C.M.R. 86, 88 (1958); see United States v. Truman, 19 C.M.A. 504, 507, 42 C.M.R. 106, 109 (1970).

light of this defense evidence, we agree with Appellant that the lower court erred when it concluded that the military judge's instruction sufficiently covered the issues that were supposed to be addressed.

The Government argues that the defense evidence, including Appellant's testimony, fails to support the defense-requested instruction relating to escalation of the violence. As a result, the Government contends that Appellant never needed the unique instructions drafted by the defense counsel. We reject this argument based on the prosecution's evidence that established Appellant's early role in the incident as a possible aggressor, the defense evidence of mutual combat, and an escalation of the conflict by others.[20]

We acknowledge that the instruction trial defense counsel presented to the military judge relating to the theory of escalation of the conflict was not perfect. The defense-requested instruction was correct, however, in its statement of the legal theory of escalation of the conflict. The only defect in the requested instruction was an imprecise statement as to the force that Appellant might lawfully use in response to an

---

[20] United States v. Jackson, 12 M.J. 163, 167 (C.M.A. 1981) ("[T]he instructional duty arises whenever 'some evidence' is presented to which the fact finders might 'attach credit if' they so desire." (quoting United States v. Evans, 17 C.M.A. 238, 242, 38 C.M.R. 36, 40 (1967))); R.C.M. 920(e)(3) Discussion (explaining that an instruction is required when there is "some evidence . . . upon which members might rely if they choose").

escalation, stating that "the accused would then be entitled to use deadly force in self-defense." It is unclear whether trial defense counsel tailored the instruction to support his argument or relied on language in a footnote of Cardwell that explained a situation where another accused was "entitled to use deadly force in his own defense."[21] A technically precise instruction should have asserted only that "the accused would then be entitled to use force the accused believed was necessary for protection against death or grievous bodily harm."[22]

This deficiency in the defense proposed instruction does not excuse the military judge from his duty to instruct the panel on the essential defense theory of escalation of the conflict as it related to self-defense.[23] Based upon the testimony favoring Appellant, the military judge was required to tailor his instructions to the facts in the case and to give an instruction that addressed the concept of escalation of the conflict.[24] His failure to do so was a deficiency that rendered

---

[21] 15 M.J. at 126 n.3.
[22] See R.C.M. 916 (e)(1)(B).
[23] See United States v. McMonagle, 38 M.J. 53, 58 (C.M.A. 1993) ("The military judge has an affirmative, sua sponte duty to instruct on special defenses reasonably raised by the evidence."); R.C.M. 920(e)(3).
[24] See Martinez, 40 M.J. at 431 ("The military judge has a duty to tailor his instructions to fit the facts of the case."). Consistent with Cardwell, a proper self-defense instruction should have informed the members of the following: "Even a person who starts an affray is entitled to use self-defense when the opposing party escalates the level of the conflict. 15 M.J. at 126. One who claims to be "subjected . . . [to] escalation

the instruction on self-defense erroneous and incomplete. As to the impact of this instructional error, this Court has stated, "Once it is determined that a specific instruction is required but not given, the test for determining whether this constitutional error was harmless is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[25]

We conclude that the error in this case is not harmless beyond a reasonable doubt. The defense theory of escalation of the conflict was a vital point in the case. This instructional error eviscerated the Appellant's self-defense theory rooted in the concept of escalation of the conflict. Because of this instructional error, Appellant was denied the opportunity to argue that he had a right to exercise self-defense due to the escalating violence being perpetrated against him. Moreover, without a correct self-defense instruction, the members did not have guideposts for an "informed deliberation."[26]

In our view the appropriate remedy for this constitutional violation is that we set aside only the guilty findings related to Appellant's murder and aggravated assault offenses (Charge I

---

of the conflict" is "allow[ed] to use reasonable force in defending against it." Id.
[25] United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).
[26] Anderson, 13 C.M.A. at 259, 32 C.M.R. at 259; see also Truman, 19 M.A. at 507, 42 C.M.R. at 109 (stating that a proper instruction "provides meaningful legal principles for the court-martial's consideration").

16

and Charge II) as the issue of self-defense was only applicable to these offenses. We conclude that there was no danger of prejudicial spillover from Appellant's murder offenses to the obstruction of justice offense.

Addressing the concept of spillover, this Court explained that the focus of concern is whether "overwhelming proof on one [offense that is set aside] will "spill over" and prejudice a legitimate defense to another.[27] In this case, there is no such danger in light of the unique trial developments arising from Appellant's testimony.

Appellant testified on the merits and admitted that he told one friend, "If it comes down to it, we were never at the movies." Appellant also admitted that it was his intent to influence this friend and he attempted to do so. Appellant's testimony is tantamount to a judicial confession to obstruction of justice as Appellant effectively admitted that he was attempting to have his friend present a false alibi and thereby thwart the police investigation into the stabbing incident.

Because of Appellant's testimony, his conviction of the Article 134, UCMJ, offense of obstruction of justice was independent of and unaffected by either the murder or aggravated assault offenses. Therefore, we conclude that there was no

---

[27] United States v. Haye, 29 M.J. 213, 215 (C.M.A. 1989).

prejudicial spillover that tainted the guilty finding to obstruction of justice.[28]

B. Evaluation of Post-Trial Delay in Appellate Process

Servicemembers have a due process right to timely review and appeal of courts-martial convictions.[29] Appellant asserts that the 1,794 days for a first-level appellate review by a service court of criminal appeals was a constitutional due process violation.

In Toohey,[30] this Court stated the legal test for determining whether Appellant's due process right was violated by excessive post-trial delay. This Court identified the following four factors to determine this issue: "(1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of his right to a timely appeal; and (4) prejudice to the appellant."[31]

---

[28] See McMonagle, 38 M.J. at 61 (concluding that instructional error as to mistake of fact was prejudicial error only to a murder offense and not to other offenses including obstruction of justice).

[29] Toohey v. United States, 60 M.J. 100, 101 (C.A.A.F. 2004).

[30] In Toohey, this Court held that the appellant established a threshold showing of facially unreasonable delay, even without showing prejudice. Id. at 103. This Court remanded to the Navy-Marine Corps Court of Criminal Appeals for it to determine whether the lengthy delay violated the appellant's Fifth Amendment right to due process and whether the delay warranted some form of relief. Id. at 104.

[31] Id. at 102 (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).

More recently in <u>United States v. Moreno</u>,[32] this Court explained, "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation."[33] The standard of review for a claim of denial of a due process right arising from denial of speedy post-trial review and appeal is de novo.[34] Consistent with this precedent, we evaluate these four factors.

### 1. Length of the delay

The lower court acknowledged that "[t]he preparation of the necessary pleadings for appellate review in this case has taken longer . . . than review of a court-martial of this length and complexity should normally take."[35] We agree.

Appellant was sentenced on March 14, 2000. When the convening authority took action on this case on January 12, 2001, 304 days had elapsed since Appellant was sentenced. This case was docketed at the lower court on February 7, 2001. Over

---

[32] 63 M.J. 129 (C.A.A.F. 2006).
[33] <u>Id.</u> at 136.
[34] <u>Id.</u> at 135 (citing <u>United States v. Rodriguez</u>, 60 M.J. 239, 246 (C.A.A.F. 2004); <u>United States v. Cooper</u>, 58 M.J. 54, 58 (C.A.A.F. 2003)).
[35] <u>Dearing</u>, 60 M.J. at 905. The lower court also concluded that no relief from this delay was warranted because there was no lack of diligence in the post-trial processing of the case and no indication of deliberate or malicious intent that caused the delay in Appellant's post-trial appellate process. <u>Id.</u> We proceed to apply the other <u>Barker</u> factors to determine if Appellant is entitled to relief for this excessive post-trial delay.

four years later, on February 10, 2005, the lower court decided this case. The almost five years for a first-level appellate review by a service court of criminal appeals is facially unreasonable as it is clearly excessive and inordinate. This Barker factor weighs heavily in favor of Appellant.

## 2. Reasons for the delay

This case is neither unusually long nor complex, and there is no reasonable explanation for why it took the convening authority over ten months to take action on Appellant's case. We note that Appellant's assigned appellate defense counsel had problems preparing this case. Over two years, original and successor military appellate defense counsel filed twenty-one motions for enlargements of time that the lower court granted. When the court refused to grant further enlargements, military appellate defense counsel filed a brief raising issues Appellant had asserted pursuant to United States v. Grostefon[36] on April 18, 2003. After the Government filed its pleading on July 18, 2003, Appellant hired civilian appellate defense counsel who entered an appearance on August 1, 2003. This counsel filed a brief on behalf of Appellant on October 17, 2003.

We acknowledge that the defense-requested delay is significant. We stated in Diaz v. Judge Advocate General of the

---

[36] 12 M.J. 431 (C.M.A. 1982).

Navy[37] and reaffirmed in Moreno[38] that the Government has the ultimate responsibility for the staffing and administrative management of the appellate review process for cases pending before lower court.  Consistent with our decisions in Diaz and Moreno, we decline to hold Appellant responsible for the lack of "institutional vigilance" that should have been exercised in this case.[39]

This case was docketed, with briefs filed by the parties, for almost fifteen months before the lower court issued its decision.  Although this was a lengthy period, "we apply a more flexible review of this period, recognizing that it involves the exercise of the Court of Criminal Appeals' judicial decision-making authority."[40]

The Government has not presented legitimate reasons or exceptional circumstances for the excessive post-trial delay that is unrelated to the lower court's decisional period.  In these circumstances, we conclude that this second Barker factor also weighs heavily in favor of Appellant.

3.  Assertion of the right to a timely review and appeal

Appellant did not assert his right to a timely review to the lower court.  However, in Moreno, we stated, "We also

---

[37] 59 M.J. 34, 38 (C.A.A.F. 2003).
[38] 63 M.J. at 137.
[39] Id. (quoting Diaz, 59 M.J. at 39-40) (quotation marks omitted).
[40] Id.

recognize the paradox of requiring Moreno to complain about appellate delay either to his appellate counsel who sought multiple enlargements of time because of other case commitments or to the appellate court that granted the enlargements on a routine basis."[41]  This is the situation in the present case also as military appellate defense counsel filed twenty-one motions for enlargements that the lower court granted.  Therefore, consistent with the approach in Moreno, we would normally weigh this factor only slightly against Appellant.[42]

In our view the facts of this case invite further analysis of this factor.  We note that Appellant personally did voice his concerns about the unreasonable appellate delay.  On January 14, 2002, in a communication with his appellate defense counsel, Appellant objected to his case "sitting idle for almost (1) one year" and inquired why he was "constantly put off in [his] post-trial proceedings."  Also, on March 10, 2002, Appellant wrote a congressman complaining that his "appellate defense counsel has neglected to show any interest at all in helping me."   In light of Appellant's communications, we conclude that this factor also weighs in favor of Appellant.

---

[41] Id. at 138.
[42] Id.

## 4. Prejudice

We are most sensitive to this final factor that relates to any prejudice either personally to Appellant or the presentation of his case that arises from the excessive post-trial delay.[43]

In our view, the lack of "institutional vigilance" in this case resulted in detailed military appellate defense counsel not filing a timely pleading to address the merits of Appellant's case. After granting twenty-one defense enlargements, the lower court indicated that it would decide the case without a brief if one was not filed by March 14, 2003. Thereafter, detailed military appellate counsel merely submitted a Grostefon submission. Ultimately, Appellate hired a civilian appellate counsel who did file a substantive brief on Appellant's behalf. From these factual developments, it appears that a lack of "institutional vigilance" effectively denied Appellant his statutory right to the free and timely professional assistance of detailed military appellate defense counsel.[44] This prejudice weighs most heavily in Appellant's favor.

As Appellant's appeal is meritorious as to Issue I, he has served oppressive incarceration during the appeal period.[45]

---

[43] Id. at 138–41.

[44] See Article 70, UCMJ, 10 U.S.C. § 870 (2000).

[45] We note that Appellant was sentenced on March 14, 2000, and is presently incarcerated. The maximum sentence for the offense of obstruction of justice is five years. Manual for Courts-Martial, United States pt. IV, para. 96.e. (2005 ed.). In our view Appellant has already suffered prejudice as he has served

Here, Appellant continues to serve the twenty-five-year sentence to confinement under a conviction that has now been set aside. The appellate delay has resulted in Appellant enduring prolonged incarceration awaiting this favorable decision on his appeal. This is a circumstance that weighs in the favor of Appellant.[46]

Although one facet of prejudice is where an appellant demonstrates "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision,"[47] Appellant has not made such a showing here.

The last consideration is whether there is any "negative impact on his ability to prepare and present his defense at the rehearing."[48]  We are most concerned that "Due to the passage of time, witnesses may be unavailable [and] memories may have faded . . . ."[49]  "In order to prevail on this factor an appellant must be able to specifically identify how he would be prejudiced at a rehearing due to the delay.  Mere speculation is not enough."[50] Presently, Appellant has not been able to establish specific harm that he would encounter at a rehearing and he has not demonstrated prejudice.

---

more than the maximum punishment for the single offense that he stands convicted.  See Moreno, 63 M.J. at 139.

[46] Id.

[47] Id. at 140.

[48] Id.

[49] Id.

[50] Id. at 140-41 (footnote omitted).

However, as we noted in Moreno, our present analysis of this issue may not terminate a later inquiry into the issue of prejudice from post-trial delay:

> We are mindful of the difficulty that an appellant and his appellate defense counsel may have at this juncture of the process in identifying problems that would hinder an appellant's ability to present a defense at rehearing. If an appellant does experience problems in preparing for trial due to the delay, a Sixth Amendment speedy-trial motion could appropriately be brought at the trial level.[51]

Consistent with Moreno, Appellant may in any later proceeding demonstrate prejudice arising from post-trial delay.

### 5.  Conclusion –- Barker factors

Our consideration of the four Barker factors leads us to conclude that Appellant was denied his due process right to speedy review and appeal. The unexplained and unreasonably lengthy delay and specific prejudice arising from the appellate delay, effectively denied Appellant his right to the free professional assistance of detailed military appellate defense counsel, resulting in a due process violation. We turn next to the relief appropriate for this constitutional violation.

### 6.  Relief afforded to Appellant because of the due process violation for denying speedy appellate review

As this due process error is one of constitutional magnitude, we are obliged to test this error for harmlessness. Indeed, "'the Government must show that this error was harmless

---

[51] Id. at 141 n.19.

beyond a reasonable doubt.'"[52]  In light of our disposition of Issue I and our conclusion that Appellant has suffered prejudice under the Barker analysis, we cannot say that the error arising from the post-trial delay is harmless beyond a reasonable doubt.

Indeed, in our view, this case involves two forms of actual prejudice.  First, Appellant has endured oppressive incarceration because he has been denied a timely review of his meritorious claim of legal error for over six years while he was incarcerated.[53]  Second, the lack of "institutional vigilance" resulted in appellate delay that effectively denied Appellant his statutory right to the free and timely professional assistance of detailed military appellate defense counsel.  This error and its impact on Appellant and his appeal mandate relief.

As to relief from the due process violation arising from the excessive and unreasonable post-trial delay, we seek to fashion a remedy that will afford Appellant meaningful relief. There is a wide range of relief options available.[54]

---

[52] United States v. Brewer, 61 M.J. 425, 432 (C.A.A.F. 2005) (quoting United States v. Miller, 47 M.J. 352, 359-60 (C.A.A.F. 1997)).
[53] See supra note 45.
[54] In Moreno we stated:

> The nature of that relief will depend on the circumstances of the case, the relief requested, and may include, but is not limited to:  (a) day-for-day reduction in confinement or confinement credit; (b) reduction of forfeitures; (c) set aside of portions of an approved sentence including punitive discharges; (d) set aside of the entire sentence, leaving a sentence of no punishment; (e) a limitation upon

We observe that we have already provided Appellant some relief arising from the error related to Issue I.  But we conclude that further relief is warranted.  However, we view dismissal with prejudice of the charges inappropriate as Appellant has not demonstrated any prejudice to defend against the charges at a rehearing.

In this case, as in Moreno, we are obliged to fashion a remedy where we have authorized a rehearing[55] and there is presently no direct sentence relief that we can provide Appellant.  In this circumstance we will afford Appellant relief depending on the later developments in this case as follows: (1) In the event of a rehearing at which the adjudged sentence includes confinement, the convening authority shall direct that Appellant be credited with an additional 365 days of confinement served; (2) In the event that the adjudged sentence at a rehearing does not include confinement, the convening authority shall approve no portion of a sentence exceeding a punitive discharge.

_____

the sentence that may be approved by a convening authority following a rehearing; and (f) dismissal of the charges and specifications with or without prejudice.  Clearly this range of meaningful options to remedy the denial of speedy post-trial processing provides reviewing authorities and courts with the flexibility necessary to appropriately address these situations on a case-by-case basis.

63 M.J. at 143.
[55] The rehearing, whether on findings and sentence or just on sentence, is free to adjudge an appropriate sentence.  See United States v. Davis, 63 M.J. 171, 175 (C.A.A.F. 2006).

27

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed only as to Charge I and Charge II and both specifications thereunder and the sentence. The findings of guilty thereon and the sentence are set aside. The decision of the United States Navy-Marine Corps Court of Criminal Appeals as to Charge III is affirmed. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing is authorized.

United States v. Dearing, No. 05-0405/NA

        BAKER, Judge (concurring in result):

        With respect to the appellate delay, I concur in this
Court's conclusion that Appellant suffered actual prejudice as a
result of enduring "oppressive incarceration because he has been
denied a timely review of his meritorious claim of legal error
for over six years while he was incarcerated."  However, I find
prejudice on this recognized Barker[1] basis alone, and therefore,
I concur in the result.

        Although the appellate delay in this case was excessive,
the facts are not sufficiently developed for this Court to
conclude that a "lack of 'institutional vigilance'" prejudiced
Appellant by denying him "his statutory right to the free and
timely professional assistance of detailed military defense
counsel."  Importantly, if Appellant was prejudiced by a denial
of his right to timely counsel, it is not clear how this case is
distinguished from the many other cases of appellate delay we
have reviewed involving twenty or more defense enlargements for
time, where we did not find that the appellants were prejudiced
by a denial of their timely right to military counsel and
affirmed.  As a matter of fairness and principle, like cases
should be treated in a like manner.

        If there is a difference distinguishing these cases of
comparable multiple enlargements, it must reside in defense

---

[1] Barker v. Wingo, 407 U.S. 514 (1972).

counsel's submission of a Grostefon[2] brief in this case. After twenty-one enlargements of time, appellate defense counsel was given a hard deadline of thirty days in which to file a brief. Appellate defense counsel responded by filing a Grostefon brief. We do not know whether appellate defense counsel did so at the eleventh hour after a cursory review of the record or, whether she did so after a careful review of the record and the exercise of her best judgment that a Grostefon brief was appropriate.

If appellate defense counsel's submission of a Grostefon brief is the only event distinguishing this case from other cases involving comparable enlargements of time, we should review counsel's submission of the Grostefon brief for ineffective assistance of counsel, as opposed to finding prejudice based on a denial of right to counsel.

The appellate delay problem in this case was that the submission of the Grostefon brief was preceded by over 1,700 days of unreasonable and excessive delay in appellate processing. The appellate delay prejudice arises because, consistent with the framework set forth in United States v. Moreno, 63 M.J. 129 (C.A.A.F. 2006), Appellant waited six years for his meritorious claim to be heard and addressed.

---

[2] United States v. Grostefon, 12 M.J. 431 (C.M.A. 1982).

CRAWFORD, Judge (dissenting):

I respectfully dissent because the majority continues a pattern of refusing to give deference to the President's legislatively mandated rulemaking authority in contravention of established principles of separation of powers.  See United States v. Moreno, 63 M.J. 129, 144 (C.A.A.F. 2006) (Crawford, J., concurring in part and dissenting in part).  Under Article 36, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 836 (2000), the President has the authority to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof" unless these provisions are inconsistent with the United States Constitution, or the UCMJ.  When one enters a fight as an aggressor or a mutual combatant, even without a weapon, the natural and probable consequences of such action includes the possibility that the fight may escalate and the other side may overcome the aggressor or the mutual combatant.  Recognizing the natural and probable consequences of being an aggressor or mutual combatant, the President has promulgated Rule for Courts-Martial (R.C.M) 916(e)(4), which includes the availability or nonavailability of the defense of self-defense.  It provides:

> The right to self-defense is lost and the defenses described in subsections (e)(1), (2), and (3) of this rule shall not apply if the accused was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had

> withdrawn in good faith after the aggression, combat,
> or provocation and before the offense alleged
> occurred.

Generally, the prosecution has the burden of proving beyond a reasonable doubt that a defense does not exist.  R.C.M. 916(b).  However, R.C.M. 916(e)(4) provides that in homicide and assault cases, the right of self-defense is lost where the individual is the aggressor or a mutual combatant.

By refusing to give deference to the President, the majority selectively[1] rejects the hierarchy[2] of this rule set

---

[1] This is not the first time that this Court has rejected rules set forth by the President.  See, e.g., United States v. Mizgala, 61 M.J. 122, 130 (C.A.A.F. 2005) (Crawford, J., dissenting in part and concurring in the result) (noting that the majority ignored the waiver rule set forth in R.C.M. 707(e)); see also United States v. Cary, 62 M.J. 277, 280 nn. 1-2 (C.A.A.F. 2006) (Crawford, J., concurring in the result) (setting forth several cases in which this Court refused to follow Supreme Court precedent when examining a constitutional right or when interpreting the same or similar statute); see, e.g., United States v. Miller, 63 M.J. 459 (C.A.A.F. 2006) (requiring an addition to R.C.M. 910 advice regarding collateral consequences); Moreno, 63 M.J. at 137-44 (setting forth speedy review rules); United States v. Key, 57 M.J. 246, 249 (C.A.A.F. 2002) (Crawford, C.J., concurring in part and in the result) (noting that despite the majority's holding there is no requirement that a staff judge advocate's recommendation on a request for deferment be served on defense counsel); United States v. Becker, 53 M.J. 229 (C.A.A.F. 2000) (applying R.C.M. 707 to sentence rehearings).  However, we have recommended the executive engage in rulemaking to eliminate appellate litigation.  See e.g., United States v. Buller, 46 M.J. 467, 469 n.4 (C.A.A.F. 1997).

[2] United States v. Lopez, 35 M.J. 35, 39 (C.M.A. 1992) (discussing the hierarchical sources of rights in the military); see also United States v. Scheffer, 523 U.S. 303, 309-18 (1998) (Military Rules of Evidence are binding on the Court of Appeals for the Armed Forces unless unconstitutional).

2

forth by the President.  The majority relies on <u>United States v.</u>
<u>Cardwell</u>, 15 M.J. 124 (C.M.A. 1983), to conclude that the
defense of self-defense allows an aggressor to "use deadly force
in his own defense, just as he would be if he withdrew
completely from combat and was then attacked by his opponent, in
instances where the adversary escalates the level of conflict."
I agree that is the proposition put forth in <u>Cardwell</u>,[3] however,
I note that <u>Cardwell</u> is another occasion where this Court
expanded the law without the authority to do so.  <u>Cardwell</u>,
decided on March 14, 1983, did not discuss the hierarchy or the
hornbook rule that this Court is bound by the President's rule
unless it is unconstitutional or violates a statute.  In 1984,
the President executed the <u>Manual for Courts-Martial, United</u>
<u>States</u> (1984 ed.)(<u>MCM</u>).  Since 1984, the President has made
twelve[4] changes to the <u>MCM</u>, yet, in spite of the ruling in
<u>Cardwell</u>, he has never saw fit to modify R.C.M. 916(e)(4) to

---

[3]    In a situation . . . where the accused had entered
       willingly into combat with the expectation that deadly
       force might be employed, he is not allowed to claim
       self-defense.  However, where an accused in his
       original attack has not employed deadly force and his
       adversary then escalates the conflict, he is entitled
       to use deadly force in his own defense, just as he
       would be if, after initially attacking, he had
       withdrawn completely from combat and was then attacked
       by his opponent.

15 M.J. at 126 n.3.
[4] <u>See</u> <u>MCM</u>, Historical Executive Orders app. 25 at A25-1 to A25-77
(2005 ed.).

allow for an aggressor to regain his right to self-defense if the "victim" or adversary escalates the level of conflict. The Cardwell case is not mentioned in the discussion of the rule or in the analysis to the rule. Common sense would seem to indicate that the President has specifically decided not to address or modify the defense of self-defense to allow the aggressor to regain the right to self-defense in situations other than after a complete withdrawal from the affray.

R.C.M. 916(e)(4) is not inconsistent with the punitive articles in the UCMJ. See Articles 77-134, UCMJ, 10 U.S.C. §§ 877-934 (2000). Because the military judge's instructions were consistent with R.C.M. 916 as created by the President, I would affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.