# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39381**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Joseph D. ROMAN**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 February 2019

————————————

*Military Judge:* L. Martin Powell (motions); Patricia A. Gruen (trial).

*Approved sentence:* Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 22 September 2017 by GCM convened at Kadena Air Base, Japan.

*For Appellant:* Major Megan E. Hoffman, USAF; Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Thomas C. Franzinger, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Senior Judge JOHNSON and Judge Dennis joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

LEWIS, Judge:

Appellant, contrary to his pleas, was found guilty by officer members of one specification of attempted sexual assault of a child and two specifications of

attempted sexual abuse of a child in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880. The officer members sentenced Appellant to a dishonorable discharge, three years of confinement, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises two issues for our consideration on appeal: (1) whether the military judge committed plain error when she failed to provide a findings instruction on the affirmative defense of lack of mental responsibility; and (2) whether the military judge erred by failing to give a sentencing instruction to not rely on possible action by the convening authority in determining a sentence. In addition, we address a facially unreasonable delay in the post-trial processing of Appellant's case. We find no prejudicial error and affirm.

## I. BACKGROUND

On 20 December 2016, Appellant responded to a social media post from a female named "Cristina" who indicated she had just broken up with her boyfriend. Appellant and "Cristina" began exchanging messages within a social media application. "Cristina" told Appellant she did not have a lot of dating options after the breakup with her boyfriend because she was only 14 years old. Appellant, who was 25 years old, replied that technically she had lots of dating options with older guys. Within a few days, Appellant's messages to "Cristina" increasingly focused on sexual topics. He would ultimately describe, in graphic detail, the various acts of foreplay and sexual intercourse he desired to do with "Cristina." He pointedly messaged "Cristina" that he "[couldn't] wait to take [her] virginity." When "Cristina" expressed concern about getting pregnant, Appellant reassured her "that's what condoms and all are for."

Within two weeks of the initial post, Appellant and "Cristina" agreed to meet at her house while her mom would be at work. Appellant instructed "Cristina" to masturbate every day until they met as it would "help" when they had sex. During the course of their messaging, Appellant requested "Cristina" send him naked pictures of herself. Appellant also sent "Cristina" at least six pictures of his erect penis and eight videos of him masturbating. In one of the videos, he references "Cristina" by name and how "[he] can't wait to be inside [her]."

On 3 January 2017, Appellant drove his vehicle to a house on Kadena Air Base, Japan to meet "Cristina." He had 14 condoms in his backpack. As "Cristina" was actually an undercover investigator for the Joint Child Crimes Task Force in Okinawa, Japan, agents from the Naval Criminal Investigative Service (NCIS) apprehended Appellant as he approached the front door. When he was confronted by NCIS agents, Appellant spontaneously stated, "I didn't believe she was 14. I wasn't going to do anything." NCIS agents turned Appellant

over to agents from the Air Force Office of Special Investigations (AFOSI) shortly after his apprehension. Once the AFOSI agents and Appellant arrived back at the AFOSI detachment, Appellant stated, "I was half wishing it was [AFOSI] because I need help."

At trial, Appellant unsuccessfully presented a defense that he actually knew "Cristina" was an undercover law enforcement agent before he sent any naked pictures or videos to "Cristina" and before he messaged her about having sex. To this end, Appellant testified that he escalated the messages to sexual topics to "mess with" law enforcement. He similarly testified that he sent the videos of him masturbating to give the "middle finger" to law enforcement or possibly "someone [who was] messing with me." Appellant indicated he got pleasure from feeling smarter than law enforcement. Appellant ultimately denied having an actual belief that he was communicating with a 14-year-old girl. Similarly, he denied the intent to have sex with a 14-year-old girl. Appellant provided multiple reasons for driving to meet "Cristina" including: (1) to prove he was correct that "Cristina" was actually a law enforcement agent; and (2) to get mental health assistance with suicidal ideations. In response to a court member question asking "How does bringing a backpack with condoms fit in your plan to get help for suicidal thoughts," Appellant responded: "I need [to be] backed into as big of a corner as possible . . . . I don't ask for help unless I feel like I have absolutely zero – any other option . . . ."

Appellant actually reached out for help about two weeks before he responded to the first posting from "Cristina." On 8 December 2016, Appellant messaged his supervisor, Technical Sergeant (TSgt) CP, "I need to talk." Appellant confided in TSgt CP that he had thoughts of harming himself. As TSgt CP knew that Appellant recently had a particularly difficult break-up with his girlfriend and TSgt CP had seen a decline in Appellant's personal hygiene, TSgt CP took Appellant to the U.S. Naval Hospital Okinawa's emergency room (ER). Appellant was evaluated for suicidal ideations at the ER and it was decided he did not need inpatient treatment. He was seen for a follow-up by the Kadena Air Base mental health clinic on an outpatient basis on 13 December 2016.

In describing these interactions with mental health professionals, Appellant testified that "[he] didn't trust mental health to take care of [him]" and "[he] didn't trust people to be able to look after [him]." He also described being "absolutely confident" that he would be arrested at the house where he was meeting "Cristina" and that his arrest was "the necessary step I needed to take to save my life."

On 17 April 2017, the Government completed a sanity board on Appellant. He was diagnosed with a severe mental disease or defect at the time of the

offenses. His specific diagnosis was "persistent depressive disorder, early on-set, moderate, with mild anxious distress." However, the sanity board found that Appellant appreciated the nature and quality or wrongfulness of his conduct and that he had sufficient mental capacity to understand the nature of the proceedings and to cooperate intelligently in his own defense.

The Defense's forensic psychologist, Dr. EB, testified during findings for the Defense.* Dr. EB explained Appellant's diagnosis as including persistent symptoms of depression that did not meet criteria for major depressive disorder. On a ranking scale of mild, moderate, or severe, Appellant received a moderate diagnosis for the time period of the offenses. His symptoms of depression began before he was 21 years old so they were "early onset," and his symptoms included feeling hopeless, a loss of interest in life, not getting pleasure from activities, and difficulty concentrating. Finally, Appellant was diagnosed with a "specifier" of mild anxious distress, which meant he had a lot of energy or "restlessness where [he] just can't stop" that combined with his persistent depressive disorder symptoms. Dr. EB noted that Appellant's treatment "in every session" focused on his ability to tolerate distress. Dr. EB described one of Appellant's red flags that aggravated his distress was "ruminating" or "excessively worrying and dwelling" rather than using productive, healthy problem solving. She described Appellant's coping mechanisms as "fragile" and lacking the breadth, depth, or diversity that would allow him to respond to different or deeper levels of distress.

Dr. EB acknowledged that she could not know Appellant's intent or why Appellant acted as he did in an exact moment. However, she noted that at times of high distress he was more prone to exercise poor judgment and engage in self-defeating behaviors than an average person. She summarized, "when he's overwhelmed his coping mechanisms, it affects his thinking and his cognition; just his cognitive processing, his ability to function at work and function in relationships, and all of that can[,] we know, can set people up for engaging in self-defeating behaviors." During cross-examination, Dr. EB agreed that seeking illicit sex with a 14-year-old child could be a self-destructive behavior and that some people use masturbation and sex as coping mechanisms.

---

* We do not attempt in this opinion to fully summarize or explore all aspects of Dr. EB's trial testimony. Instead, we include the portions relevant to the issue before us. We focus on several of her explanations of Appellant's mental health diagnosis of persistent depressive disorder and a later comparison she made about Appellant's decision-making during periods of high distress.

## II. DISCUSSION

### A. Lack of Mental Responsibility

#### 1. Additional Background

At trial, Appellant's trial defense counsel never raised a defense of lack of mental responsibility. During a discussion on findings instructions, trial defense counsel requested tailored instructions but never mentioned lack of mental responsibility. Nor did trial defense counsel object when the military judge did not *sua sponte* include such an instruction.

Instead, trial defense counsel utilized Appellant's mental health condition as support for the actual defense strategy that Appellant knew law enforcement was impersonating a 14-year-old girl and he was engaging in an ill-advised cat-and-mouse game with them so he could eventually get apprehended and get help. Appellant does not raise an allegation that his trial defense counsel's actual strategy constituted ineffective assistance of counsel.

On appeal, Appellant argues that his testimony and the testimony of Dr. EB reasonably raised the defense of lack of mental responsibility. As the military judge did not *sua sponte* give an instruction on lack of mental responsibility, Appellant argues that she erred and that error was not harmless beyond a reasonable doubt. We disagree that the military judge erred. As we do not find error, we do not test for harmlessness beyond a reasonable doubt or consider the defense's burden to prove the defense of lack of mental responsibility by clear and convincing evidence under Rule for Courts-Martial (R.C.M.) 916(b)(2).

#### 2. Law

The adequacy of a military judge's instructions is reviewed de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006). "The military judge bears the primary responsibility for ensuring that mandatory instructions . . . are given and given accurately." *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003). Instructions on findings shall include "[a] description of any special defense under R.C.M. 916 in issue." R.C.M. 920(e)(3). Lack of mental responsibility is an affirmative defense under R.C.M. 916(k)(1). Special defenses are often called affirmative defenses. R.C.M. 916(a), Discussion.

The military judge must instruct the members "on the availability and legal requirements of an affirmative defense if 'the record contains some evidence to which the military jury may attach credit if it so desires.'" *United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2003) (quoting *United States v. Brown*, 43 M.J. 187, 189 (C.A.A.F. 1995)) (additional citations omitted). An affirmative defense is "in issue" when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose."

*United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012) (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)); *United States v. Watford*, 32 M.J. 176, 178 (C.M.A. 1991) (noting a defense is reasonably raised when there is "'some evidence' to which the [panel] members might attach credence." (quoting *United States v. Taylor*, 26 M.J. 127, 129–30 (C.M.A. 1988))). "Any doubt whether an instruction should be given should be resolved in favor of the accused." *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000) (citing *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981)). "Where an instructional error raises constitutional implications, [we have] traditionally tested the error for prejudice using a 'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (footnote omitted) (quoting *Dearing*, 63 M.J. at 482).

Article 50a(a), UCMJ, 10 U.S.C. § 850a(a) describes the defense of lack of mental responsibility.

> It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.

R.C.M. 916(k)(1) contains almost identical language to Article 50a(a). R.C.M. 916(k)(3) states "[t]he accused is presumed to have been mentally responsible at the time of the alleged offense. This presumption continues until the accused establishes, by clear and convincing evidence, that he or she was not mentally responsible at the time of the alleged offense." *See also Leland v. Oregon*, 343 U.S. 790 (1952) (finding no due process violation when Oregon was the only state to require an accused to prove an insanity defense beyond a reasonable doubt); R.C.M. 916(b)(2). Generally, once a defense "is placed in issue by some evidence, the prosecution shall have the burden of proving beyond a reasonable doubt that the defense did not exist." *United States v. Berri*, 33 M.J. 337, 343 (C.M.A. 1991) (quoting R.C.M. 916(b)). Lack of mental responsibility is an exception to that general rule. R.C.M. 916(b)(2).

**3. Analysis**

The military judge had conclusive evidence that Appellant suffered from a severe mental disease or defect, persistent depressive disorder, at the time of the offenses. The sanity board, which was ordered by the convening authority, found as much. However, there was not "some evidence" presented during the trial that Appellant was "unable to appreciate the nature and quality or the wrongfulness of the acts." Indeed, his defense at trial hinged on his knowledge and confidence that he would be apprehended by law enforcement when he

tried to meet "Cristina." Additionally, he described sending the sexually ex-plicit pictures and videos and communicating sexually explicit language as in-tentional efforts to "mess with" law enforcement and prove he was smarter than them. When asked during his testimony what he would have done if a 14-year-old girl had opened the door, he stated, "I'd turned [sic] around and just drove [sic] away."

Dr. EB, a qualified expert in forensic psychology in well over 100 trials, conducted extensive preparation prior to her trial testimony. She reviewed both the NCIS and AFOSI investigative reports, Appellant's mental health rec-ords, and the full sanity board report. She interviewed Appellant and his ex-girlfriend and did her own psychological testing of Appellant. Dr. EB did men-tion Appellant's persistent depressive disorder affected his thinking and cog-nitive processing. But she also concluded this only set him up for self-defeating behaviors or made him more prone than the average person to engage in such behavior. Dr. EB's testimony fell well short of being "some evidence" that Ap-pellant was unable to appreciate the nature and quality or the wrongfulness of the acts themselves at the time of the offenses. The military judge had no *sua sponte* duty to instruct on lack of mental responsibility.

## B. Sentencing Instructions

Appellant argues the military judge erred by failing to give a sentencing instruction to not rely on possible action by the convening authority in deter-mining a sentence. We find no such error.

As above, we review the adequacy of a military judge's instructions de novo. *Dearing*, 63 M.J. at 482. "The military judge bears the primary responsibility for ensuring that mandatory instructions . . . are given and given accurately." *Miller*, 58 M.J. at 270. R.C.M. 1005(e)(4) requires the military judge to provide an instruction "informing the members that they are solely responsible for se-lecting an appropriate sentence and may not rely on the possibility of any mit-igating action by the convening or higher authority."

In this case, the military judge both orally and in writing instructed the members: "You must not adjudge an excessive sentence in reliance upon pos-sible mitigating action by the convening or higher authority." Additionally, af-ter the parties presented their sentencing arguments, the military judge pro-vided oral and written instructions to the members that "you alone are respon-sible for determining an appropriate sentence in this case." We find the mili-tary judge properly instructed the members as required by R.C.M. 1005(e)(4).

### C. Post-Trial Delay

#### 1. Additional Background

On 6 December 2017, the convening authority took action on Appellant's case. On 8 January 2018, the case was docketed with this court, 33 days after convening authority action. The record contains no explanation for the three-day delay in docketing Appellant's case.

#### 2. Law

In *United States v. Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of a facially unreasonable delay when the record of trial is not docketed with the service court of criminal appeals within 30 days of the convening authority's action. 63 M.J. 129, 142 (C.A.A.F. 2006). Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id*. at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

In *Moreno*, the CAAF identified three types of cognizable prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Where, as in this case, the appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id*. at 139 (citation omitted). Similarly, where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id*. at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*.

#### 3. Analysis

In this case, Appellant has not requested relief under *Moreno* so there is no assertion that the post-trial delay amounted to a denial of his due process rights. Similarly, there is no assertion of any particularized anxiety or concern during the delay between convening authority action and docketing with this court.

As we find no prejudice and assess the remaining *Barker* factors as not so egregious as to undermine confidence in the fairness and integrity of the military justice system, we find no violation of Appellant's due process rights. Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–25 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that such an exercise of our authority is not appropriate in this case.

## III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court